AO 241
(Rev. 10/07)

Page 2

### PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
### HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Eastern District |
|---|---|

| Name (under which you were convicted):  Lakeisha Shanae Adams | Docket or Case No.:  12-3046 |
|---|---|

| Place of Confinement :  Louisiana Correctional Institute for Women | Prisoner  SECT. *B* MAG. 1  551775 |
|---|---|

| Petitioner (include the name under which you were convicted)  Lakeisha Shanae Adams | v. | Respondent (authorized person having custody of petitioner)  James Rogers, Warden |
|---|---|---|

| The Attorney General of the State of  Louisiana |
|---|

### PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    22nd Judicial District Court, P.O. Box 607, Franklinton, LA 70438-0607
    Washington Parish

    (b) Criminal docket or case number (if you know): 06-CR6-094104

2.  (a) Date of the judgment of conviction (if you know): March 25, 2009

    (b) Date of sentencing: March 25, 2009

3.  Length of sentence: Life

4.  In this case, were you convicted on more than one count or of more than one crime?  ☐ Yes  ☒ No

5.  Identify all crimes of which you were convicted and sentenced in this case:

6.  (a) What was your plea? (Check one)

    ☐ (1)  Not guilty            ☐ (3)  Nolo contendere (no contest)

    ☐ (2)  Guilty               ☒ (4)  Insanity plea

TENDERED FOR FILING

DEC 21 2012

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury    ☐ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes    ☒ No

8.  Did you appeal from the judgment of conviction?

☒ Yes    ☐ No

9.  If you did appeal, answer the following:

(a) Name of court: First Circuit Court of Appeal

(b) Docket or case number (if you know): 2009-KA-2015

(c) Result:  Sentence Affirmed

(d) Date of result (if you know): 7/17/10

(e) Citation to the case (if you know):

(f) Grounds raised:

Insufficient Evidence
Motion to Suppress Evidence

(g) Did you seek further review by a higher state court?    ☒ Yes    ☐ No

If yes, answer the following:

(1) Name of court:  Louisiana Supreme Court

(2) Docket or case number (if you know):  2010-KO-1375

(3) Result: Denied

(4) Date of result (if you know):  1/7/2011

AO 241
(Rev. 10/07)

(5) Citation to the case (if you know):

(6) Grounds raised:

     Same grounds as 9(f)

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes  ☒ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions

concerning this judgment of conviction in any state court?    ☒ Yes    ☐ No

11.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court: 22nd Judicial Court

(2) Docket or case number (if you know):

(3) Date of filing (if you know):   1/4/2012

(4) Nature of the proceeding:  Application for post-conviction relief

(5) Grounds raised:

    1.) Denial of trial and sentencing transcripts and other relevant records
    2.)Coerced, illegal confession
    3.) Insufficient Evidence
    4.) Ineffective Assistance of Counsel
        a.) Unable to assist in own defense
        b.) Waived Jury trial, Government and Court agreed, defense attorney
           set a hearing without Petitioner present and changed to Jury Trial
        c.) Motion to suppress raised improperly
        d.)Failure to investigate

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes  ☒ No

(7) Result:  Denied

(8) Date of result (if you know):

AO 241
(Rev. 10/07)

Page 5

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: First Circuit Court of Appeal

(2) Docket or case number (if you know): 2012-KW-0504

(3) Date of filing (if you know):

(4) Nature of the proceeding: Post-conviction relief

(5) Grounds raised:

Same as 11(a)(5)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result: Denied with dissenting opinion

(8) Date of result (if you know): 6/4/2012

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: Louisiana Supreme Court

(2) Docket or case number (if you know): 12-KH-1408

(3) Date of filing (if you know):

(4) Nature of the proceeding: post-conviction relief

(5) Grounds raised:

Same as 11(a)(5)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result: Denied

(8) Date of result (if you know): 11/02/2012

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:   ☒ Yes   ☐ No

(2) Second petition:  ☒ Yes   ☐ No

(3) Third petition:   ☒ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:




12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** Violation of Fourth, Sixth, Eighth, and Fourteenth Amendment rights by continuously denying her requests for complete transcripts. If effect, denying her rights to judicial review, due process, and the equal protection clause guaranteed by the Constitution.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The abysmal state of the record in this second degree murder case includes no pre-trial, trial, or sentencing transcripts, which prevented Petitioner from adequately raising all meritorious issues of appeal. It is well settled that an appellant in a criminal case has a constitutional right to a complete record of all evidence upon which his conviction was based. This right is necessary to implement the right to an appeal and right to challenge a conviction through collateral proceedings. This is not a situation where insubstantial potions of the record are missing, Adams has NO transcripts. The missing transcripts are material and vital to her defense on review. She has been forced to rely on her faulty memory to file post-conviction despite her numerous attempts to get the transcripts.




(b) If you did not exhaust your state remedies on Ground One, explain why:

N/A

AO 241
(Rev. 10/07)

(c)   **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:

This claim was not applicable until I began filing my petitions pro se.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Post-conviction

Name and location of the court where the motion or petition was filed:

22nd Judicial District Court, Franklinton, LA Washington Parish

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

See Exhibits

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?   ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

First Circuit Court of Appeal

Docket or case number (if you know):   2012-KW-0504

Date of the court's decision:   6/4/2012

Result (attach a copy of the court's opinion or order, if available):

Denied with dissenting opinion

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

AO 241
(Rev. 10/07)

Page 8

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:

Appeal to Louisiana Supreme Court 12-KH-1408
Denied 11/02/2012

GROUND TWO: Adams' conviction was obtained by use of coerced confession during a time that
she was mentally incompetent to be questioned.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): The State attempted to show
that Adams understood what had happened when giving her statement and she was not under the
influence of fear, duress, intimidation, menaces, threats, or promises. The idea of mental
illness or intoxication never came into play with this testimony, thus relieving the officers
from any responsibility or recognition that Adams was incapable of waiving her rights or that she
was more suseptible to suggestions made by the officers.The investigators had convinced Adams
that if she said what they wanted her to say, the DA would "help" her. They used her incoherence
to intimidate her into believing that she was already under arrest and that if she cooperated,
the DA would help her. The record reflects that the interrogating officers were aware of, and
exploited, defendant's psychological velnerablilities in order to obtain statements from her. If
the confession tape was viewed, you would see that Adams failed to answer several questions that
were asked, most questions had to be repeated, and all of the questions were leading. Even the
prosecutor agreed that the questions were leading. Dr. Deland provided the most insight by saying
that someone suffering from a mental illness was more susceptible to suggestions than normal.

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)     Direct Appeal of Ground Two:

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes   ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:
        Direct Appeal was done by the Louisiana Appellate Project with no input from
        Adams and without contacting her prior to filing.

(d)     Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
        Same as ground one
Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

AO 241
(Rev. 10/07)

Page 9

Result (attach a copy of the court's opinion or order, if available):

> Same as ground one

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☒ No

(4) Did you appeal from the denial of your motion or petition?  ☒ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☒ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

> Same as Ground one

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :

have used to exhaust your state remedies on Ground Two

**GROUND THREE:** The conviction in this case cannot stand for it fails to meet the legal
standard for sufficiency of evidence. Ms. Adams proved by a preponderance of the
evidence that she was insane at the time of J.A.'s death and the State failed
to prove either of the elements of Second Degree Murder.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Defense counsel noted early
on that Adams was suffering from some type of mental illness and the Court concluded that she was
incompetent to stand trial. The proceedings were stayed for two years while Adams was treated to
restore her competency. Each of the examining psychiatrists for the competency hearing agreed
that Adams was suffering from sever depression. She had additional diagnoses of postpartum
depression, post-traumatic stress syndrome, and paranoia. Each causes intense psychological
distress. The two elements of Second Degree Murder were also never proven. There was no felony to
be in the commission of, and there was no cruel intent. The confession tape that was used against
Adams stated clearly that she did not mean to hurt him. Three years after the crime, several
psychiatrists were asked to determine Adams'sanity at the time of the offense. Most of them made
determinations based upon probabilities and conceded that most of the information they received
came from the State's investigation. Only Dr. Deland went the extra step to question family
members.

(b) If you did not exhaust your state remedies on Ground Three, explain why?

N/A

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☒ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:
                              Same as ground one
Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?     ☐ Yes     ☒ No

(4) Did you appeal from the denial of your motion or petition?     ☒ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☒ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

        Same as ground one
Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:** Adams was denied her right to effective and adequate assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments. There are 6 subtitles under this claim.(See memorandum in support of habeas)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): 1-Adams was not allowed to be involved in her own defense. 2-Adams waived her right to a Jury trial for several substantial reasons and her defense attorney went to court without her present and asked for a Jury trial. This was Adams' decision to make, her right. This was taken away from her by her own attorney. She felt that the jury would not understand her complicated case and has important reasons for wanting a judge only. 3-Defense counsel erred when they failed to make a motion to suppress videotaped confession on the ground of incompetency. Petitioner was incompetent at the time of her arrest and her interrogation, but the atty. failed to make the motion to suppress using this information. 4-Defense counsel erred when they failed to investigate. The Sixth Amendment imposes on counsel a duty to make reasonable investigations or to make a reasonable decision that makes investigations unnecessary. The file Defense attorneys accumulated during this case is abysmal, no invesigations were done. The State's witnesses were allowed to lie without contest because counsel did not know what to ask them.

(b) If you did not exhaust your state remedies on Ground Four, explain why:

N/A

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?.     ☐ Yes    ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:

Ineffective Assistance of Counsel is an issue best raised in post-conviction relief, and it was raised in post-conviction.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Same as Ground one

Name and location of the court where the motion or petition was filed:

**Same as ground one**

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?          ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?     ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

**Same as ground one.**

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)       **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

AO 241
(Rev. 10/07)

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court
       having jurisdiction?    ☒   Yes       ☐   No
       If your answer is "No," state which grounds have not been so presented and give your reason(s) for not
       presenting them:

(b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so,
       ground or grounds have not been presented, and state your reasons for not presenting them:
                                            N/A

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction
       that you challenge in this petition?        ☐   Yes     ☒   No
       If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues
       raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy
       of any court opinion or order, if available.

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for
       the judgment you are challenging?        ☐   Yes     ☒   No
       If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the
       raised.

AO 241
(Rev. 10/07)

16.    Give the name and address, if you know, of each attorney who represented you in the following stages of the

judgment you are challenging:

(a) At preliminary hearing: Barry Bolton, Attorney at Law, 712 Louisiana Avenue, Bogalusa, LA
                                                                                                         70427

(b) At arraignment and plea:
                                  Same as 16(a)

(c) At trial:    Same as 16(a)

(d) At sentencing:  Same as 16(a)

(e) On appeal: Margaret Sollars, Louisiana Appellate Project

(f) In any post-conviction proceeding:  Pro Se

(g) On appeal from any ruling against you in a post-conviction proceeding:   Pro Se

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?         ☐ Yes    ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?         ☐ Yes    ☐ No

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*
     This application should not be barred by the one year period unless this Honorable
Court denies equitable tolling. Petitioner is within the statute of limitations.

AO 241
(Rev. 10/07)

Page 15

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

    (A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

    (C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241
(Rev. 10/07)

(2)    The time during which a properly filed application for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:

Vacate sentence and remand for a new trial, a judge trial, as Petitioner requested.
Lacking this relief, Petitioner requests an evidentiary hearing to present her claims
more clearly to the Court.

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for
Writ of Habeas Corpus was placed in the prison mailing system on    12-20-2012    (month, date, year).

Executed (signed) on    12/17/2012    (date).

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

JURISDICTION .............................................................................................. 1

STANDARD OF REVIEW .............................................................................. 2

PROCEDURAL HISTORY............................................................................. 2

DISCUSSION.................................................................................................. 4

LAW AND ARGUMENT ............................................................................... 6

CLAIM ONE .................................................................................................. 6

CLAIM TWO.................................................................................................. 10

CLAIM THREE............................................................................................... 18

CLAIM FOUR ................................................................................................ 32

      Issue 1 ............................................................................................... 32

      Issue 2 ............................................................................................... 33

      Issue 3 ............................................................................................... 40

      Issue 4 ............................................................................................... 44

CONCLUSION............................................................................................... 49

CERTIFICATE OF SERVICE ....................................................................... 51

CERTIFICATE OF COMPLIANCE ............................................................. 52

APPENDIX...................................................................................................... 53

# TABLE OF AUTHORITIES

## JURISPRUDENCE

### Federal Cases

*Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)..12

*Connelly*, 479 U.S. at 164 ........................................................................................ 13

*Connelly*, 479 U.S. at 164-65, 107 S. Ct. at 520-21.................................................. 11

*Culombe v. Connecticut*, 367 U.S. 568, 602, 6 L.Ed.2d 1037, 81 S.Ct. 1860 (1961) 16

*Glover* ...................................................................................................................... 15

*Griffin v. Illinios*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) .......................... 10

*Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) ............................ 6

*In re Warmington*, 212 Wis.2d 657, 668 568 N.W.2d 641 (1997) ...................... 46, 47

*In re Wolfram*, 174 Ariz. 49, 847 P.2d 94, 96 (1993) .................................................. 47

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)....... 22, 23

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)................ 21

*Moore v. Johnson* ..................................................................................................... 47

*Powell v. Alabama*, 53 S.Ct. 55 (1932).................................................................... 44

*Reck v. Pate*, 367 U.S. 433, 6 L.Ed.2d 948, 31 S.Ct. 1541 (1961)............................. 16

*Rogers v. Richmond, 365 U.S. 534, 5 L.Ed.2d 760, 81 S.Ct. 735* ............................... 16

*Sanders v. Ratelle*, 21 F. 3d 1446, 1456 (9th Cir. 1994) ............................................ 45

*Singer v. United States*.............................................................................................. 35

*Singer v. United States,* supra at 37 ........................................................................... 35

*Strickland, 466 U.S. at 691* ....................................................................................... 45

*United States v. Chrismon*, 965 F.2d 1465, 1469 (7th Cir. 1992)............................... 11

*United States v. DeCoster*, 487 F.2d 1197 (DC Cir. 1973) ......................................... 44

*United States v. Decoster*, 487 F.2d 1197 ...................................................................... 46

*United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) ........................................ 11

*United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) ........................................ 13

*United States v. Raymer*, 876 F.2d 383; 1989 U.S. App. (5th Cir.) (1989) ................ 15

*United States v. Rynes*, 218 F.3d 319 .......................................................................... 46

*United States v. Selva*, 559 F.2d 1303, 1977 U.S.App. LEXIS 11368, (9/28/77)....... 10

*United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983) ................................................ 46

## State Cases

*Availa v. Galaza,* 297 F.3d 911, 918-919 (9th Cir. 2002)............................................. 45

*Blackburn v. Alabama*, 361 U.S. 199, 4 L.Ed.2d 242, 80 S.Ct. 274 (1960)......... 15, 16

*Carter*, 327 So.2d at 490-91 ........................................................................................ 37

*Coles v. Peyton*, 389 F.2d 294 (4th Cir. 1968)............................................................. 46

*Smith v. Mullin*, 379 F.3d 919, 935 (10th Cir. 2004).................................................. 12

*State ex rel. Bernard v. Criminal District Court* ............................................................ 7

*State v. Birdsong*, 452 So.2d 1236 (La.App. 2nd Cir.) *writ denied*, 457 So.2d 1200 (1984)
.................................................................................................................................... 21

*State v. Bordelon*, 597 So.2d 147 (La.App. 3rd Cir. 1992) ........................................... 16

*State v. Chinn*, NO. 2011-KK-2043 ............................................................................. 33

*State v. Claibon*, 395 So.2d 770 (La. 1981).................................................................. 21

*State v. Douglas, 278 So.2d 485 (La. 1973)* ................................................................ 32

*State v. Drew, 202 La. 8, 11 So.2d 12 (1942)* .............................................................. 32

*State v. Glover*, 343 So.2d 118 (La.1979)..................................................................... 20

*State v. Glover, supra*.................................................................................................... 16

*State v. Glover*, supra .................................................................................................. 18

*State v. Hochenedel*, 253 La. 263, 217 So.2d 392 (1968) ............................................. 32

*State v. McLean*, 216 La. 670, 44 So. 2d 698 (1950) ..................................................... 32

*State v. Nealy*, 450 So.2d 634 (La. 1984) ....................................................................... 21

*State v. Peoples*, 383 So. 2d 1006 (La. 1980) ............................................................... 32

*State v. Peters*, 94-0283 (La. 10/17/94), 643 So.2d 1222 ............................................ 21

*State v. Peters*, supra .................................................................................................... 21

*State v. Roy, supra*......................................................................................................... 19

*State v. Sepulvado*, 26, 948 (La.App. 2nd Cir. 5/10/95), 655 So.2d 623,

*writ denied*, 95-1437 (La. 11/13/95), 662 So.2d 465 .................................................... 19

*State v. Sepulvado, supra*............................................................................................... 21

*State v. Silman,* 95-0154 (La. 11/27/95), 663 So.2d 27, 32 ......................................... 19

*State v. Silman*, supra..................................................................................................... 21

*State v. Simmons*, 443 So.2d 512, 516 (La. 1983)......................................................... 11

*State v. Singley, 195 La. 519, 197 So. 218(1940)*.......................................................... 32

*State v. Trudell*, supra .................................................................................................... 18

*State v. Williams*, 346 So.2d 181 (La.1977) .................................................................. 19

## STATE STATUTES AND RULES

**28 U.S.C. § 2254** ................................................................................................... 1, 2, 4

**Rule 23(a) of the Federal Rules of Criminal Procedure** ..................................... 35, 36

**La. Code Crim. Proc. Ann. Art. 641** .......................................................................... 20

**La. Code Crim. Proc. Ann. art. 703 D** ....................................................................... 40

**La. Code Crim. Proc. Ann. art. 703(C)** ...................................................................... 20

La. Code Crim. Proc. Ann. Art. 717 ............................................................... 9

La. Code Crim. Proc. Ann. Art. 822 ............................................................... 9

La. Rev. Stat. Ann. art. 14:14 ...................................................................... 20

La. Rev. Stat. Ann. art. 15:432 .................................................................... 20

La. Rev. Stat. Ann. art. 15:451 .................................................................... 20

La. Code Crim. Proc. Ann. Art. 652 ............................................................. 19

La. Code Crim. Proc. Ann. Art. 834 ............................................................. 36

La. Code Crim. Proc. Ann. Art. 843 ............................................................... 8

La. Code Crim. Proc. Ann. Art. 930.8 ............................................................ 4

LSA-R.S. 14:14 ............................................................................................ 19

LSA-R.S. 14:30 .............................................................................................. 2

LSA-R.S. 14:30.1 ........................................................................................... 2

LSA-R.S. 15:432 .......................................................................................... 19

LSA-R.S. 44:3 et seq ..................................................................................... 9

LSA-R.S. 44:32(C) ......................................................................................... 9

## <u>CONSTITUTION</u>

Fourth Amendment ...................................................................................... 6

Sixth Amendment ........................................................... 6, 32, 37, 39, 44, 45

Eighth Amendment .................................................................................... 6, 8

Fourteenth Amendment ......................................................................... 6, 8, 32

La. Const. Art. 1, § 2, 19, and 22 ............................................................ 6, 7, 8

La. Const. Art. I § 17(A) ..................................................................... 33, 34, 37

La. Const. Art. III § 2 ................................................................................... 37

**La. Const. Art. I § 13** ......................................................................................... 32, 44

**La. Const. Art. XII, 10(C)** ....................................................................................... 37

## Other

*By Prof. Louis M. Natali, <u>The National Institute for Trial Advocacy,</u> Notre Dame Law School* ........................................................................................................... 38

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

## NEW ORLEANS DIVISION

**LAKEISHA ADAMS,**                    C.A._____
        PETITIONER

**VERSUS**                             DIVISION_____

**WARDEN, LOUISIANA CORRECTIONAL**
 **INSTITUTION FOR WOMEN**
        RESPONDENT

## MEMORANDUM
## IN SUPPORT OF PETITIONER'S
## WRIT OF HABEAS CORPUS

**NOW INTO THIS HONORABLE COURT COMES** LaKeisha Shanae Adams, pro se, who hereby submits this petition for a Writ of Habeas Corpus under **28 U.S.C. § 2254** on the grounds as set forth in more detail below, that she is in the custody of the State of Louisiana, pursuant to a conviction for second degree murder and sentence of life, in violation of the Constitution and laws of the United States.

## <u>JURISDICTION</u>

Jurisdiction in this cause is invoked pursuant to **28 U.S.C. § 2254**, vesting this Court with the authority to review this Petition for Writ of Habeas Corpus.

1

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively revised federal habeas corpus proceedings under 28 U.S.C. § 2254.   AEDPA went into effect on April 24, 1996; therefore, applies to the instance petition for writ of habeas corpus.

## PROCEDURAL HISTORY

On December 5, 2005, after two statements to the local law enforcement, Adams was arrest for the death of her three-month-old son, J.A[1] a violation of **LSA-R.S. 14:30;** first-degree murder.  A bill of indictment was filed on January 18, 2006, charging Adams with the death of her three month old infant son, a violation of second-degree murder **LSA-R.S. 14:30.1.**[2]

Adams was arraigned on January 25, 2006, and entered a plea of "*Not Guilty*", which was changed on June 1, 2006, to "*Not Guilty and Not Guilty by Reason of Insanity*".  A competency commission was appointed and the proceedings were suspended until a report could be made to the Court.

The Court heard testimony on January 31, 2007 receiving reports from Dr. Rafael Salcedo, Dr. John Thompson, Jr., and Dr. Sarah Deland, at which time the Court determined that Adams was not competent to proceed to trial due to her mental state and her lack of understanding concerning her legal rights. All of the

---

[1] In accordance with LSA-R.S. 46:1844(W), the infant victim is referenced only by his initials.
[2] Bill of Indictment

2

psychiatrists reported that they did not have enough information to render a decision concerning Adams sanity at the time of her son's death. Adams was ultimately remanded to the Feliciana Forensic Facility for evaluation and treatment from April 18, 2007 until June 4, 2008, when another competency hearing was held. At this point, the Court held that Adams was competent to go to trial. On August 11, 2008, the Court ordered a sanity commission to examine Adams to determine if she was sane at the time of the crime.

Jury selection began on March 9, 2009, and opening statements were given at the end of the next day. The jury returned a verdict of guilty of second-degree murder. Sentencing was held March 28, 2009, and the Court sentenced Adams to life imprisonment without the benefit of parole, probation, or suspension of sentence. The written notice for appeal was signed April 24, 2009.

The Louisiana Appellant Project filed Adams' direct appeal and the Court of Appeal First Circuit affirmed her conviction and sentence. Adams then filed her *pro se* Application for Supervisory Writs to the Louisiana Supreme Court, which was denied.[3]

The District Court of Washington Parish rendered a decision on Adams' Application for Post-Conviction on February 27, 2012 filed with the District Court

---

[3] *State v. Adams*, 39 So.3d 848, 2010 La. App. Unpub. LEXIS 267 (La. App. 1 Cir. 2010); 52 So.3d 885; 2011 La. LEXIS 34, NO. 2010-KO-1375 (La. January 7, 2011)

3

on February 29, 2012 and later served on the defendant Lakeisha S. Adams through the United States Postal Service on March 2, 2012.[4]

Court of Appeal, First Circuit rendered their decision denying Adams' Post-Conviction on June 4, 2012 wherein J. Hughes, dissents in part and stated that he would grant the writ in part on the issue of defendant's choice of bench trial rather than a jury trial.

The initial Application for Post-Conviction Relief was timely filed to the Louisiana Supreme Court on June 19, 2012, docket number 2012-KH-1408, in accordance with *LSA-C.Cr.P. art. 930.8* and *28 U.S.C. 2254*. A supplemental brief was filed on October 1, 2012, and the Post-Conviction was denied on November 5, 2012. A petitioner for rehearing was filed on November 12, 2012, and was denied on December 14, 2012, delivered to Adams by U.S. Mail on December 17, 2012.

## DISCUSSION

Adams' motion is based upon four (4) grounds. (1) First, Adams' avers that she was denied her right to due process and judicial review when the trial court continues to deny her requests for a copy of her trial transcripts, sentencing transcripts, and voir dire. (2) Secondly, Adams argues that a statement must be voluntarily and intelligently given to be admissible evidence at trial. Lakeisha Adams' statements were not free and voluntary because of her delusional state and

---

[4] See Order for Reasons rendered by William J. Burris, District Court Judge, Division "E" dated February 27, 2012.

the use of improper questioning techniques by the police, such as promises that the District Attorney would "help" her if she said what they wanted her to say. Ms. Adams was found to be incompetent prior to her trial and ordered to Feliciana Forensic Unit. She was required to stay there for over a year. When Ms. Adams' "confession" was recorded, she was delusional and the police kept her in a small room with officers for hours prior to turning the recorder on. (3) The conviction in this case cannot stand for it fails to meet the legal standard for sufficiency of the evidence. Ms. Adams met her burden of proving by a preponderance of the evidence that she was insane at the time of J.A.'s death and the State failed to prove either of the elements of Second Degree Murder. (4) Lastly, Adams was denied her right to effective and adequate assistance of counsel at trial in many ways: ISSUE #1- Adams was not allowed to be involved in her own defense; ISSUE # 2- defense attorneys erred when requesting a jury trial without Adam's knowledge or consent, after Adams had previously requested a bench trial with the Judge and was granted a Court date for bench trial by the Judge, in agreement with the District Attorney, Ms. Adams, and the Court; ISSUE #3- Defense counsel erred when they failed to make a motion to suppress videotaped confession on grounds of incompetency; ISSUE #4- Defense counsel erred when they failed to investigate.

## LAW AND ARGUMENT

**Claim No. 1:**
**Adams' rights were violated when the trial court continuously denied her request for a copy of the complete transcripts and the District Attorney's File. In effect, denying her rights to judicial review, due process, and the equal protection clause which is guaranteed by the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 1, § 2, 19, and 22 of the 1974 Louisiana Constitution.**

Petitioner has not received her trial or sentencing transcripts and has been forced to file her appeals and post-conviction from her memory alone; she has now been denied at the Louisiana Supreme Court level and is quickly exhausting all of her avenues of relief without any assistance that would be provided by having her transcripts to review. This is, in effect, denying her rights to judicial review, due process, and the equal protection clause which is guaranteed by the **Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution** and **Article 1, § 2, 19, and 22 of the 1974 Louisiana Constitution.**

It has been well established that a criminal defendant has a right to a record on appeal, which includes a complete transcript of all proceedings pre-trial and also, at trial. Furthermore, for an indigent defendant to have adequate access to the appellate process, a trial transcript **must** be provided by the State. *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

Since Adams is an indigent inmate and has remained indigent, she filed her PCR and set out specific claims showing a particularized need for the documents to

prove her constitutional rights were violated in accordance to *State ex rel. Bernard v. Criminal District Court*, supra. Even after filing the PCR and being denied at EVERY state level, she still has not been provided with any documents.

This is not a situation where insubstantial portions of the record are missing, but Adams has **no** transcripts, pre-trial, trial, or sentencing. The missing transcripts are material. Material omissions require reversal of Adams' conviction according to the *La. Const. Art. I § 19*. One of Adams vital claims is ineffective assistance of counsel, it is impossible for her to provide proof of her claims without the supporting records. She has provided the State with a particularized need and they will not send her trial transcripts.

Adams is suffering extreme prejudice by the missing records. Had Adams possessed all of the transcripts she would have proven beyond a shadow of doubt that her constitutional rights were violated and that she is not guilty of the second-degree murder. Adams cannot properly litigate any of her claims. Furthermore, this has prejudiced Adams to the point she has been convicted, sentenced to life, and denied complete judicial review on direct appeal and on her collateral attack all the way through the Supreme Court.

Due to Adams being denied access to her pre-trial transcripts, a complete trial transcript, that includes: the jury voir dire, open and closing arguments, evidence submitted, jury instructions, all bench conferences, verdict return, and

sentencing transcript, the District Attorney's file, and mental health records; her due process and equal protection clause rights, which are guaranteed by the United States Constitution and the Louisiana Constitution, have been violated. In the event Adams' conviction and sentence are not vacated, it is incumbent upon this Honorable Court to order the compilation of a complete record and allow her to supplement the original PCR after she has received a copy of the requested documents. This violates of her right to judicial review and due process under the ***Eighth*** and ***Fourteenth Amendments*** **of the United States Constitution and *La. Const. Art. I § 2, 19, a*nd 22.**

It is well settled that an appellant in a criminal case has a constitutional right to a complete record of all evidence upon which his conviction was based: *"No person shall be subjected to imprisonment...without the right of judicial review based upon a complete record of all evidence upon which the judgment is based..."* ***La. Const. Art. I § 19.*** This right is necessary to implement the right to an appeal and right to challenge a conviction. In order to implement this constitutional right, the district courts are under an affirmative duty to record the entirety of trial proceeding in felony proceedings under **LSA-C.Cr.P. art. 843.**

Adams filed a Motion for Production of Documents, in which the trial court stated, *"Per Curiam There is a procedure for petitioner to receive transcripts,*

8

*previously provided for her from her appellate counsel."*[5] No transcripts were ever provided by appellate counsel.[6]

Adams filed a Motion for Contradictory Hearing with District Attorney as provided under in which the trial court, *"Denied.  This case has been concluded so the Discovery provisions of the Code of Criminal Procedure do not apply.  **C.Cr.P. Article 717** is a Pretrial Discovery Article.  **C.Cr.P. Article 822** is totally inapplicable."*[7]

On March 7, 2011, Adams again filed a Motion to Obtain District Attorney file and other Public Records Pursuant to **LSA-R.S. 44:32(C)**. The Honorable Judge stated, *"Denied at this time. Movant must first make a request to District Attorney or other agency and comply with **R.S. 44:3 et seq**."*[8]

In addition, to the above filings Adams has repeatedly requested all the documents from her trial attorneys Mr. Barry Bolton (Hereinafter referred to as Bolton) and Mr. Allen J. Myles, and state appellant attorney, Ms. Margaret S. Sollars (Hereinafter referred to as Sollars) to no avail.

It bears emphasis that where denial of equal protection is the issue, it matters not, that the indigent had a fair opportunity to present a defense and have his

---

[5] Motion For Production of Documents denied 3/17/11

[6] See Exhibit (Letter from Margaret Sollars)

[7] Motion For Contradictory Hearing with District Attorney as Provided Under **LSA-C.Cr.P. art. 822** denied 2/23/11

[8] Motion to Obtain District Attorney file and other Public Records Pursuant to **LSA-R.S. 44:32(C)** denied 3/17/11

conviction reviewed on direct appeal. The unfairness born of discrimination denying equal protection is as offensive to the Constitution as any unfairness resulting from procedural deficiencies in the criminal system.

It has been well established that a criminal defendant has a right to a record on appeal, which includes a complete transcript of all proceedings pre-trial and also, at trial. In *United States v. Selva*, 559 F.2d 1303, 1977 U.S.App. LEXIS 11368, (9/28/77). Furthermore, for an indigent defendant to have adequate access to the appellate process, a trial transcript must be provided by the State. *Griffin v. Illinios*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

Adams has suffered psychologically, physically, and financially which has ultimately deprived her of life, liberty, and property, which the Constitution of the United States guarantees each citizen.

## Claim No. 2:

**A statement must be voluntarily and intelligently given to be admissible evidence at trial. Lakeisha Adams' statements were not free and voluntary because of her delusional state and the use of improper questioning techniques by the police, such as promises that the District Attorney would "help" her if she said what they wanted her to say; therefore, the trial court erred in denying the motion to suppress her statements. Ms. Adams was found to be incompetent prior to her trial and ordered to Feliciana Forensic Unit. She was required to stay there for over a year. When Ms. Adams' "confession" was recorded, she was delusional and the police kept her in a small room with officers for hours prior to turning the recorder on. She eventually stated what she was told to say and what she believed they wanted to hear.**

*Connelly* has modified our former jurisprudential rule that intoxication may negate the voluntariness of a statement if it is of such a degree that it renders the defendant "unconscious of the consequences of what he is saying." *State v. Simmons*, 443 So.2d 512, 516 (La. 1983) quoting *Colorado v. Connelly*, 479 U.S. 157, 168-69, 107 S. Ct. 515, 522-23, 93 L. Ed. 2d 473 (1986). After Connelly, diminished mental capacity, which may result from intoxication, remains relevant to the voluntariness of a statement only to the extent that it "made mental or physical coercion by the police more effective." *United States v. Chrismon*, 965 F.2d 1465, 1469 (7th Cir. 1992); see also *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (test is "whether these mental impairments caused the defendant's will to be overborne") A defendant's mental condition still properly figures into the voluntariness calculus. Police exploitation of the mental condition of a suspect, using "subtle forms of psychological persuasion," could render a confession involuntary. *Connelly*, 479 U.S. at 164-65, 107 S. Ct. at 520-21.

The defense attorney failed to establish that Adams was incapable, due to her delusional state, to knowingly, intelligently, and voluntarily waive her rights. The defense attorney failed to make a Motion to Suppress **due to mental incompetency**.

The State attempted to show through the testimony of the police officers that Adams understood what had happened when she gave her statements and she was

not under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. The idea of mental illness or intoxication due to her medications did not even come into play with this testimony, thus relieving the police from any responsibility or recognition that Adams was incapable of waiving her rights or that she was more susceptible to suggestions made by the officers. The State kept making the point that no promises were made, but in fact, the investigators had **absolutely convinced** Adams that if she said what they wanted her to say that the **District Attorney** would help her. She believed this so strenuously that the Sanity Commission doctors relayed the information to the trial judge in open court. The officers used her incoherence to intimidate her into believing she was already under arrest and that if she cooperated with any and all statements they wished her to make, the District Attorney would "help" her.

The record reflects that the interrogating officers were aware of, and exploited, defendant's psychological vulnerabilities in order to obtain statements from her. Significantly, the Supreme Court has acknowledged that recently, "interrogators have turned to more subtle forms of psychological persuasion," resulting in greater emphasis being placed upon the defendant's mental condition when determining the voluntariness aspect of a confession. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); see *Smith v. Mullin*, 379 F.3d 919, 935 (10th Cir. 2004) (finding a defendant's mental impairments

relevant because they can enhance a defendant's "susceptibility to police coercion"). However, the Court also explained that "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" ***Connelly***, 479 U.S. at 164.

If the confession tape was reviewed, you would see that Ms. Adams failed to answer several questions that she was asked, most questions had to be repeated, and **all** of the questions were leading. Even the prosecutor agreed that many leading questions were used in the videotaped interview and, as Dr. Deland noted, some questions had to be repeated and others were not answered. "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." ***United States v. Newman***, 889 F.2d 88, 94 (6th Cir. 1989).

Dr. Deland provided the most insight into Adams' mental condition at that time and stated that someone suffering from a mental illness was more susceptible to suggestions than a normal person. Dr. Deland also stated that someone in Adams' mental state could appear lucid for a period of time. Immediately after the video confession tape was made, Adams was placed on suicide watch and mental

13

treatment was started at a local clinic several days later. This alone proves that the officers were aware of Adams fragile state of mind the entire time they were questioning her.

Also important was the information that the police knew that Adams was on several types of depressant and pain medications, yet no steps were made to ensure that Adams understood her rights and was competent to give a statement. Adams was asked if she was taking prescription medication and admitted that she was under the influence, yet no tests were run to ensure that her level of intoxication was at a level that would allow her to understand her legal rights. Instead, they questioned if she was under the influence of any illicit drugs, prescription drugs, or alcohol; when she admitted that she was, they proceeded to question her anyway and then testified at trial that she blamed her lack of coherence on prescription medications. The questioning officers cannot attempt to claim that they were not aware of the medications; Adams even told the officers that she had taken an excess of medication that evening in a suicide attempt and they used the information she gave them in response to their questions as evidence that she was attempting to "blame" the crime on the fact that she was intoxicated.

"Notions of free will have no place in assessing the voluntariness of a confession or Miranda waiver. Instead, the voluntariness of the waiver or confession depends on the absence of police overreaching, not on free choice in

14

any broader sense of the word. The relevant test no longer focuses on the defendant's free will, as it has in the past. Instead, the focus is on the presence or absence of police coercion. A defendant's mental condition still properly figures into the voluntariness calculus. Police exploitation of the mental condition of a suspect, using subtle forms of psychological persuasion, could render a confession involuntary. Thus, while the appellate court still examines the totality of the circumstances to determine voluntariness, that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary under constitutional law." *U.S. v. Raymer*, 876 F.2d 383; 1989 U.S. App. (5th Cir.) (1989).

All of the forensic experts agreed that Adams was suffering from severe depression, postpartum depression, and paranoia; she was treated for this and psychosis.  Some other psychiatrists opined that Adams also suffered from posttraumatic stress disorder brought on by the stabbing by Ms. Franklin. Additionally, the Court found that Adams was incompetent and did not understand her rights and she was treated at Feliciana Forensic Unit for over a year.

In making this determination, we must look to the purposes behind the rule that only voluntary statements can be admitted at trial. In *Glover* we found two of these purposes to be to insure that convictions are based on trustworthy and reliable evidence, see *Blackburn v. Alabama*, 361 U.S. 199, 4 L.Ed.2d 242, 80

S.Ct. 274 (1960), and ***Reck v. Pate***, 367 U.S. 433, 6 L.Ed.2d 948, 31 S.Ct. 1541

(1961) (Justice Douglas, concurring), and to guarantee that the statements were the

products of defendant's free and rational choice.   This latter rule was stated in

***Culombe v. Connecticut***, 367 U.S. 568, 602, 6 L.Ed.2d 1037, 81 S.Ct. 1860 (1961)

as follows:

> "*The ultimate test remains that which has been the only clearly
> established test in Anglo-American courts for two hundred years: the
> test of voluntaries.  Is the confession the product of an essentially free
> and unconstrained choice by its maker?  If it is, if he has willed to
> confess, it may be used against him.  If it is not, if his will has been
> overborne and **his capacity for self-determination critically
> impaired**, the use of his confession offends due process.  Rogers v.
> Richmond, 365 U.S. 534, 5 L.Ed.2d 760, 81 S.Ct. 735.  The line of
> distinction is that at which governing self-direction is lost and
> compulsion, of whatever nature or however infused, propels or helps
> to propel the confession.*"

The defendant is entitled to present expert witness testimony regarding his

capacity to waive his rights and make a free and voluntary confession.  ***State v.***

***Bordelon***, 597 So.2d 147 (La.App. 3rd Cir. 1992); ***State v. Glover***, *supra*. Moderate

mental retardation and low intelligence or illiteracy do not of themselves vitiate the

ability to knowingly and intelligently waive constitutional rights and make a free

and voluntary confession. However, in the instant case Adams was in no way able

to knowingly or intelligently waive her constitutional rights or make a free and

voluntary confession. The State bears the burden of proving that the mental defect

or condition did not preclude the voluntary and knowing giving of a confession.

They did not meet this burden; in fact, shortly afterward, the Judge deemed Adams incompetent. Adams was considered incompetent from the time of her arrest until her release from Feliciana Forensic Unit. Until she received treatment and attended Legal Rights classes, Adams did not understand her rights at all, much less have the ability to intelligently waive them.

Even the prosecutor agreed that many leading questions were used in the videotaped interview and, as Dr. Deland noted, some questions had to be repeated and others were not answered. Thus, the failure to consider Adams' mental state and history, as well as the manner in which the videotaped interview was conducted, rendered her statements involuntary. Adams was placed in a police unit, unable to leave, for an hour after discovering her son was dead. Then she was lied to by her interrogators who gave her false information about the evidence they found. No efforts were made to determine whether Adams was in a mental state to understand, much less to waive her rights, when she was interrogated. Moreover, the setting for the interrogation had Adams "boxed in" such that she could not have asserted her rights, nor was she ever informed that she was free to leave after she was placed in the police unit. There was never an opportunity, even if Adams had been able to talk about what she was thinking and feeling. The questioning was meant only to elicit incriminating answers without any regard for what was appropriate for a person suffering, at minimum, severe depression with suicidal

17

and psychotic overtones. As the interrogation continued, without regard to her mental state, Adams finally just agreed that that she placed J.A. in the dryer for the reasons they wanted her to say.

Under these conditions, the State had a heavy burden of proving, beyond a reasonable doubt, that the confession was voluntary; in that it was trustworthy and the product of a free and rational choice. *State v. Glover*, supra; *State v. Trudell*, supra. The trial court erred when the Judge denied the motion to suppress and the State was allowed to introduce the statements at trial. Adams' statements were not free and voluntary because the evidence established that she was psychotic and her capacity for rational thought was critically impaired. This prejudiced Adams' severely; it was stated that the confession was the most incriminating evidence against her. The outcome of trial would have considerably differed had the confession been suppressed. The use of this confession offends due process and, as a result, this conviction should be vacated and a new trial ordered on the basis of this error.

## Claim No. 3:
**The conviction in this case cannot stand for it fails to meet the legal standard for sufficiency of the evidence. Ms. Adams met her burden of proving by a preponderance of the evidence that she was insane at the time of J.A.'s death and the State failed to prove either of the elements of Second Degree Murder.**

No rational trier of fact could have found that the defense failed to carry its burden of proving by a preponderance of the evidence that Adams was delusional

and insane at the time she committed this crime. While it is acknowledged that great deference is ordinarily given to the trier of fact on such issues, it is submitted that the jury's decision to find that the state bore its legal burden of proof, when confronted with the overwhelming evidence submitted by the defense establishing Adams' insanity, was manifestly erroneous and reversible error occurred.

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. *LSA-R.S. 15:432*. To rebut the presumption of sanity, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. *LSA-C.Cr.P. Art. 652* and *State v. Silman*, 95-0154 (La. 11/27/95), 663 So.2d 27, 32. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or mental defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. *LSA-R.S. 14:14*; *State v. Williams*, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. *State v. Sepulvado*, 26, 948 (La.App. 2nd Cir. 5/10/95), 655 So.2d 623, *writ denied*, 95-1437 (La. 11/13/95), 662 So.2d 465. All evidence, including expert and lay testimony, besides the defendant's conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. *State v. Roy, supra.*

Although the State bears the burden of proving that a confession or exculpatory statement is free and voluntary pursuant to **La. Rev. Stat. Ann. art. 15:451; La. Code Crim. Proc. Ann. art. 703(C)**; the prosecution is required to prove this beyond a reasonable doubt. The United States Supreme Court has held that the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary, but that the states are free to adopt a higher standard. **La. Rev. Stat. Ann. art. 15:432** presumes that the defendant is sane and responsible for his actions and places upon the accused the burden of proving the existence of a mental abnormality which, under the circumstances may have destroyed the voluntary nature of his confession; he is not required to prove a particular kind of "insanity." The legislature has not defined insanity for this purpose as it has with regard to insanity at the time of an offense, **La. Rev. Stat. Ann. art. 14:14**, and mental capacity to proceed, **La. Code Crim. Proc. Ann. art. 641**. A most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that the United States system of law enforcement should not operate so as to take advantage of a person in this fashion. ***State v. Glover***, 343 So.2d 118 (La.1979). Appellant would not have had to **try** to prove that she was incompetent and did not

understand her rights, the trial court ordered her to Legal Rights classes and **determined** her not competent.

Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane; the issue is for the jury to decide. *State v. Sepulvado*, *supra*; *State v. Birdsong*, 452 So.2d 1236 (La.App. 2nd Cir.) *writ denied*, 457 So.2d 1200 (1984). Lay testimony concerning the defendant's actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. *State v. Peters*, 94-0283 (La. 10/17/94), 643 So.2d 1222; *State v. Claibon*, 395 So.2d 770 (La. 1981).

In reviewing a claim for insufficiency of evidence where an affirmative defense of sanity is raised, this Honorable Court must apply the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard requires that the Court determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could beyond a reasonable doubt, which the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Silman*, supra; *State v. Peters*, supra; *State v. Nealy*, 450 So.2d 634 (La. 1984).

Defense counsel noted early on that Adams was suffering from some type of mental illness and the Court concluded that she was indeed incompetent to go to trial. The proceedings were stayed for almost two years while Adams was treated to restore her competency. Each of the examining psychiatrists for the competency hearing agreed that Adams was suffering from severe depression. Once Adams regained competency, the issue of her sanity at the time of the offense was not resolved. Other psychiatrists who treated Adams gave an additional diagnosis of postpartum depression, post-traumatic stress disorder and paranoia. Each one of these disorders causes intense psychological distress. Although, postpartum occurs after the birth of a child and post-traumatic stress disorder is marked by horrifying memories, which are reoccurring causing "flashbacks". It is unclear if the post-traumatic stress disorder is caused by the repeated sexual abuse Adams experienced as a child or if it was when she was repeatedly attacked prior to Adams' arrest.

Moreover, even if the defendant was not precluded from raising this claim, the assignment of error would fall for lack of merit. The elements of Second Degree Murder are: (1) When the offender has a specific intent to kill or to inflict great bodily harm; (2) When the offender is engaged in the perpetration or attempted perpetration of a felony. The State did not meet their burden by proving either of these elements. ***Jackson v. Virginia***, <u>443 U.S. 307</u>, 99 S. Ct. 2781, <u>61 L.</u>

Ed. 2d 560 (1979). Never was it even alleged that Adams was engaged in perpetration of another felony, so the State attempted to rely on specific intent; which they failed to prove. Even if the involuntary statement was to be held against Adams, she stated clearly on the tape, "I didn't mean to hurt him!" Adams was visibly delusional and upset; yet even then, it was obvious that she had no cruel intent.

Three years after the crime, several psychiatrists were asked to determine Adams' sanity when the crime occurred. Dr. Thompson and Dr. Deland examined Adams for a second time, and Drs. Vosburg and LeBourgeois examined her one time to determine sanity. All were looking for psychotic symptoms that showed Adams was detached from reality and did not know right from wrong.

Dr. Thompson determined that the videotape and the 911 call did not reveal psychotic symptoms. He made his determinations based upon probabilities and conceded that most of the information he received came from the State's investigation. He did not talk with members of Adams' family. He was aware that Adams was treated for psychosis, had reported trying to commit suicide several times, and exhibited paranoid behavior. Adams did not talk with him about the baby's death.

Dr. Thompson was not asked to determined diminished capacity or specific intent. Dr. Thompson agreed that experts could disagree about the medical

probability of their conclusions and tried to look at things as being more probable than not, and he agreed that opinions are based on good or bad facts.

Adams was originally treated for depression and psychosis. The most significant thing for Dr. Thompson was the videotape. Most of Dr. Thompson information came from the State and he generally accepted it as true. At their first interview, Adams did not want to talk about her baby's death, nor did he talk to members of her family. He actually began his interview with Adams by stating, "Word on the street is you did this because you were jealous of the other girl having a baby for your boyfriend." All of the experts who examined her agreed that Adams suffered from major depression, that she had asked for psychological help on three separate occasions before her son's death, and that she reported some paranoid symptoms. Dr. Thompson added that a person can go in and out of sanity, but he depended on probabilities to make a judgment.

Dr. Charles Vosburg, an expert in forensic psychology, examined Adams for a sanity diagnosis over three years after the death of her son. He sat through most of Dr. Thompson's testimony prior to his testimony, and had worked with him at the forensic facility. Dr. Vosburg's method of evaluation was called "redundant validity," or looking for what is consistently repeated throughout all of the information. He concentrated on the three months prior to and after an act.

When Dr. Vosburg examined Adams and spoke with her family members on the telephone, he saw signs of depression, but no psychotic symptoms. Adams denied having any memory of doing harm to her son, but she had heard voices prior to his death. Dr. Vosburg was aware that another doctor had diagnosed Adams with postpartum depression. Dr. Vosburg was aware that Adams had described a black car that was chasing her when she had an automobile accident a month before her son's death, and that she said she tried to commit suicide the night of J.A.'s death. Dr. Vosburg disagreed with Dr. Thompson's conclusion that this was a fake suicide because there were other medications available than the one pill bottle Dr. Thompson considered. There was no doubt in Dr. Vosburg's mind that Adams was depressed. Dr. Vosburg had only seen her one time and this was three years after her son's death.

It didn't make sense to Dr. Vosburg that Adams would put the baby in the dryer to keep him from crying when she was not trying to hurt him, especially when she said she had done it before and she was suffering from thoughts of suicide. Adams had no memory of harming her son and at times didn't think he was dead. Dr. Vosburg believed the child was well taken care of and that Adams loved him. Dr. Vosburg was also aware that Adams's grandmother said Adams wanted everything perfect for her child.

Dr. Herbert LeBourgeois worked at the forensic facility and was accepted as another expert in forensic psychiatry. Dr. LeBourgeois, too, examined Adams to determine her sanity at the time of the crime. Dr. LeBourgeois heard the previous expert testimony and examined many records. He stated that Adams met the criteria for a major depressive episode and posttraumatic stress disorder due to the attack by Franklin. Adams also reported some psychotic symptoms.

Dr. LeBourgeois agreed that he had said Adams was possibly psychotic, but she did not report hallucinations on the day of the crime. People could go in and out of insanity and that the police had provided most of the information Dr. LeBourgeois used to evaluate Adams.

Dr. Deland testified that she believed Adams was insane when the baby died. Dr. Deland examined Adams for competency and sanity. Dr. Deland was the only woman who examined Adams, and this may explain why Dr. Deland was able to get Adams to open up more and talk. Also, Dr. Deland was the expert who made a special effort to speak with members of Adams' family, friends, and school teachers; learning of the startling changes in her personality after the birth of her son. Dr. Deland felt this was particularly important and was convinced with a medical certainty that Adams was unable to know right from wrong at the time of J.A.'s death. Dr. Deland diagnosed Adams with severe depressive episode having psychotic features and postpartum onset in partial remission. Adams' energy was

focused on her children and her thoughts were so disorganized and out of touch with reality that she was unable to think logically.

Family and friends confirmed that Adams clearly showed a significant change in her behavior prior to and after J.A.'s death. High school friends describe Adams as a "bubbly" and playful person who changed into someone who isolated herself, would go into dazes, and get mad for no reason. Adams would sit in the dark and mumble to herself, and she thought everyone was against her. A teacher and a guidance counselor at Adams' school confirmed these changes.

Family members described Adams' bizarre behavior and paranoid delusions. While they were not aware of any suicide attempts, they recognized that something was badly wrong. Adams threatened family members two times with either a knife or a hammer. They testified that there was no reason for her to do this. She also wandered throughout the streets at night for no apparent reason and related instances of someone following and trying to harm her. Adams was hysterical. Armed with a knife, it took a lot of persuasion to convince Adams to let her relatives in the house when they could find no one who matched the description of her assailant. Another similar instance occurred when Adams had an automobile accident and described someone who was chasing her; the accident could not have occurred as she described.

Montrel Jones, the father of J.A., believed that Adams was crazy the day of the baby's death. He testified that Adams just talked crazy when she called him the whole day that J.A. died, but he knew she loved J.A. Even Ms. Franklin, who overheard these conversations, believed Adams was being truthful. Additionally, all of the witnesses, particularly the police officers, had difficulty believing a rational Adams would have put her child in the dryer to calm him down then call the police.

Dr. Sarah Deland was the last of the forensic experts to testify. The experts agreed that their opinions were only as good as the facts they were given. They also agreed that most of their information came from the police investigation. Only Dr. Deland went the extra step and spent extra time questioning members of Adams' family, friends, and school teachers. Adams' first involvement with mental health was when she was 15 and had disclosed sexual abuse. Adams became depressed during her first pregnancy, but did not receive treatment. Adams mental health really began to deteriorate after the birth of her son and several medications were prescribed.

Also, the State's doctors depended on the 911 call and the videotape to form their opinions. Dr. Deland considered these recordings, but she explained, as well as Dr. LeBourgeois, that sanity waxes and wanes. A person can appear sane for short period of time, but this appearance cannot be maintained. Furthermore, in

Adams' delusional state, she was more susceptible to answering leading questions, the technique used in the videotape. The police had informed Adams of things that were not true. We have no idea what was said prior to the tape; she was questioned for hours and tired and worn down. Dr. Deland was less concerned with the tape and more concerned with Adams' change in personality. Her children were always taken care of, but Adams did not take care of herself. Adams often was not groomed and remained in pajamas all day. This was totally out of character for Adams. Dr. Deland also stated she had turned down cases because she was not convinced that her testimony would be helpful.

The defense proved by a preponderance of evidence that Adams was insane at the time of the offense. In light of the totality of the evidence adduced, no rational trier of fact could have found beyond a reasonable doubt that the defense had not met its burden. The overwhelming nature of the expert testimony fully supported by the lay testimony of Adams' family and friends, as well as third parties, left no room or support for the jury's verdict. It is incumbent upon this Court to conclude that the jury acted irrationally in the face of the evidence. As such, the evidence was insufficient to find Adams guilty of Second Degree Murder at the time of the offense and a reversal of her conviction is required.

When she was in jail, Adams was placed on suicide watch, taken to the mental health clinic, and prescribed antipsychotic drugs. After she was found

incompetent, Adams continued treatment with antipsychotic medication and reported having hallucinations. At the hospital Adams was paranoid and hyper-vigilant. Adams became particularly excited when one of the attendants touched her hair and she thought they were doing voodoo on her.

When Adams was interviewed, she had trouble putting her thoughts together and staying on topic. Adams also said that the warden struck her and was sending people to mess with her, that she was receiving messages from God, and she wasn't convinced her son was dead. At the second interview Adams was much better and accepted the fact that her son was dead. Adams ability to concentrate and her memory were much improved.

Dr. Deland diagnosis of Adams was major depressive episode severe, with psychotic features, and with postpartum onset in partial remission. Dr. Deland also thought Adams may have been dealing with posttraumatic stress disorder stemming from the attack by Franklin with a knife. Dr. Deland had to really work hard to get Adams to talk, particularly about the voices and hallucinations. Adams reported she was scared the day of J.A.'s death and took a lot of medication and she thought something bad was going to happen. Adams didn't remember putting her son in the dryer.

This was a very difficult case but based upon the delusions and the psychotic features, Dr. Deland determined that Adams could not distinguish right from

wrong at the time of J.A.'s death. All of Adams' energy was focused on her children and not on taking care of herself. Adams was unable to think coherently and her thoughts were so disorganized and out of touch with reality that she was unable to think logically. Adams was unable to contemplate the issue of right or wrong. Dr. Deland believed this with a medical certainty.

Dr. Deland reviewed the videotaped confession and believed that someone suffering from a mental illness was more susceptible to suggestions than a normal person. Dr. Deland agreed that Adams had not reported the hallucinations to the other doctors, but she interjected that she had to work a long time to elicit these answers. All of the doctors agreed on the depression diagnosis.

Dr. Deland believed that Adams showed psychosis by the change in the person she was before, her hallucinations, and her withdrawal from others, and her deep depression. Adams was not able to think rationally. Dr. Deland declared that mental illness waxes and wanes and it is not uncommon for the mentally ill to think clearly for a short period of time, but it cannot be maintained for long. Dr. Deland agreed that remorse was evident on the videotape, but it was not evident at the time of the crime. The tape showed that some questions had to be repeated and that Adams never answered all of the questions. The event itself spoke of a disturbance, but lucid intervals happen all the time and can change within 30 minutes. The videotape did not change Dr. Deland mind.

The trial court erred by denying the Motion to Suppress the video statement. Had the statement been suppressed, the outcome of this trial would have been very different. The video statement was not freely or voluntarily given and its introduction into evidence prejudiced Adams greatly.

As in *State v. Peoples, 383 So. 2d 1006 (La. 1980),* the Louisiana Supreme Court has repeatedly held that although insufficiency of evidence is not a question of law and may not be reviewed, a total lack of evidence is a question of law and may be considered, provided that an assignment of error properly perfected presents all the evidence so that we may determine whether there is a total lack of evidence to prove a {383 So. 2d 1009} crime or an essential element thereof. *State v. Douglas, 278 So.2d 485 (La. 1973); State v. Hochenedel, 253 La. 263, 217 So.2d 392 (1968); State v. McLean, 216 La. 670, 44 So. 2d 698 (1950); State v. Drew, 202 La. 8, 11 So.2d 12 (1942); State v. Singley, 195 La. 519, 197 So. 218(1940).* Even though imperfect expressions of the rule have appeared in some of our opinions, in actual practice this Court has not departed from this rationale.

## Claim No. 4:

**Adams was denied her right to effective and adequate assistance of counsel at trial as guaranteed by the 6th and 14th Amendments of the United States Constitution and guaranteed by Article 1 Section 13 of the 1974 Louisiana Constitution.**

**ISSUE #1-** ADAMS WAS NOT ALLOWED TO BE INVOLVED IN HER OWN DEFENSE

Had Bolton had more contact with Adams, she would have been prepared to tell her side of the story and answer questions that the jury had in their mind

concerning her actions. Not being involved in her own defense was prejudicial to Adams because she was not able to assist with the selection of her witnesses and have any input on the questions that were asked of the witnesses that were questioned. The outcome of the trial would have been drastically different had Adams been able to show the jury that she was reaching out for help for her mental illness prior to her arrest, and her primary care physician, ob-gyn doctor, and a Bogalusa LSU Medical Center emergency room doctor could have offered a lot of insight into her mental illnesses and the countless times that she had visited their offices seeking help.

**ISSUE # 2- JURY VERSUS JUDGE TRIALS-This was ultimately Ms. Adams decision to make. She appeared in open court, waived her right to a jury trial—the State and the Court agreed—then the Defense attorney appeared before the Court in the absence of the Ms. Adams and requested a Jury trial.**

In *State v. Chinn*, NO. 2011-KK-2043, the Louisiana Supreme Court ruled on February 10, 2012. It clearly states several times that it is a defendant's **Constitutional** right to waive trial by jury.

> *"In this case, proper application of La. Const. art. I, 17(A) required the district court to take into account two considerations. First, as the district court properly recognized, the defendant has a constitutional right to request a waiver of a jury trial. Second, because La. Const. art. I, 17(A) prescribes a time limit for exercising that right; the district court could not accept a waiver and simultaneously set a trial date within the forty-five-day time limit of the constitutional provision. To protect the defendant's constitutional right to waive a jury trial in this matter, the trial date could not be set within forty-five days such that the right to waive the jury trial would be lost. The constitutional provision bestowed a right upon defendants to waive the right to a*

trial by jury. The defendant shall exercise his right to waive trial by jury in accordance with the time limits set forth in Article 521. However, with the permission of the court, he may exercise his right to waive trial by jury at any time prior to the commencement of trial. In this case, the court of appeal relied on a literal application of La. Const. art. I, 17(A) to hold that the district court erred in allowing the defendant to waive his right to trial by jury less than forty-five days prior to the scheduled trial date. However, as the defendant points out, such a literal application of the constitutional provision produces a result clearly unintended by the redactors of the provision: **it allows the State**, as it admittedly attempted in this case, **to deprive a defendant in a non-capital proceeding of the constitutionally guaranteed right to waive a trial by jury** simply by moving for a trial setting within the forty-five-day period engrafted onto the original constitutional provision by the 2010 amendment. **A literal application here produces a result demonstrably at odds with the intent of the redactors of the constitutional amendment, who, had they desired to deprive the defendant of the right to waive a trial by jury, and not just limit the time period in which that right might be exercised, could have simply deleted the right to waive a trial by jury altogether. That they did not do so is most telling and dispositive of the issue presented in this case. The constitution is the supreme law of this state, to which all legislative acts must yield.** When a statute conflicts with a constitutional provision, the statute must fall."

This instant case does not entail the time restrictions that are now inflicted, as the statute was not amended until 2010; even if Adams was placed under this time restraint, she met it completely by requesting a judge trial several months before her trial commenced. It does however, compel this Honorable Court to recognize the fact that Adams had a Constitutional right to waive trial by jury, the Court and the Prosecution agreed that she made this waiver knowingly and intelligently; the defense attorney's actions denied her this fundamental right.

Rule 23(a) of the Federal Rules of Criminal Procedure provides: "Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government." This was given. The Appellant, the Court, and the State all agreed to proceed with a bench trial in Adams' case. The DEFENSE ATTORNEY, who has no rights, came back and requested trial by jury. We are not attempting to argue the constitutionality of Rule 23(a) of the Federal Rules of Criminal Procedure, which required that a waiver of jury trial must be "with the approval of the court and the consent of the government" as in ***Singer v. United States***. This issue in this present case isn't whether the court and the government agreed to try the case by judge alone. The issue is that the Appellant, the Government, and the Court **ALL** agreed to a bench trial in the presence of the Appellant; the Appellant's Counsel later made a motion for a Jury trial without the Appellant present and without her consent or her knowledge.

We are also not attempting to convince the Court that the interest of saving time and costs were the deciding factors in Appellant's decision to waive her right to a jury as was held in other cases. (***Singer v. United States,*** supra at 37). Appellant avers that she knowingly and intelligently waived her right to a jury because she felt it was a situation where passion, prejudice, public feeling, and general understanding of the situation would render it impossible or unlikely to

35

have a fair, impartial trial by jury. She had an insanity defense and several psychologist witnesses testifying for and against her and she did not feel a layman would be able to understand or decide which information was correct.

On August 11, 2008, the Twenty-Second Judicial Court convened on this matter; wherein, the defendant Lakeisha Adams was heard before the Honorable Judge Patricia Hedges to request a waiver of trial by jury. Adams was advised of her rights, waived her rights, and it was ordered to proceed with a trial by judge. The State, the Court, and the Defendant all agreed to proceed with a trial by judge. **Federal Rules of Criminal Procedure Rule 23(a)** states, "Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government." It is clearly stated in Adams' sentencing minutes, on August 11, 2008, "This matter was taken up and submitted to the court and the court finds the defendant has knowingly and voluntarily made her decision to waive her right to a trial by jury. The Court hereby grants the defendant's motion and advised this matter will be set for judge trial October 29-October 31, 2008."

**Louisiana Code of Criminal Procedure Article 834 provides that the defendant has the right to be present during the making, hearing of, or ruling on a preliminary motion or application addressed to the court.** However, on December 8, 2008, the court convened and the defense attorney filed a Motion to

36

select Trial by Jury which was granted by the Court. Adams was not present at the December 8, 2008 hearing nor did she have any knowledge of the hearing; therefore, she was unable to object to the motion being carried in court. **There was never a discussion between Adams and her defense attorney about proceeding with a jury trial.** This was done solely at the discretion of Barry Bolton, the defendant's trial counsel, after she had knowingly and intelligently waived her right to a jury trial.

**La. Const. art. I, 17** bestows a right upon defendants to waive the right to a trial by jury. Trial by judge or by jury is a means or mode of proceeding by which a legal right is enforced and is thus a procedural matter which falls within the scope of **Art. XII, 10(C).** *Carter*, 327 So.2d at 490-91. Petitioner's argument is that a defendant in a criminal case has not only an unconditional constitutional right, guaranteed by **Art III, 2,** and the **Sixth Amendment,** to a trial by jury, but also an equal right to have her case decided by a judge alone if she considers such a trial to be to her advantage. The Constitution's guarantee of a fair trial gives defendants the right to safeguard themselves against possible jury prejudice by insisting on a trial before a judge alone.

"Trial by jury is the rule and a departure from this method of trial must be approved by both the defendant and the government. The government will often quickly agree to such a disposition. This is especially true in those cases where

counsel is only going to trial to preserve a legal issue for appeal. In some instances the government may agree to a bench trial in order not to offend the trial judge. The procedure is cheaper and quicker but **should only be considered in the below stated circumstances where:** (1) the case revolves around a legal issue that a jury will not like, *e.g.*, insanity or other *mens rea* issue or a mere presence defense which a jury will not abide. In these instances, a judge is more likely to understand the issues and follow the law; (2) the client has no factual issues or evidence to contest the charges but insists on pleading not guilty; (3) the judge will resolve the facts in a way a jury will not.   There must be clear, articulable reasons for waiving a jury trial. **Finally, the decision to waive a jury trial belongs to the defendant, not to counsel.** Counsel must carefully assess the pros and cons but, at the end of the day, it is the defendant's decision." *By Prof. Louis M. Natali, **The National Institute for Trial Advocacy, Notre Dame Law School.*** Adams meets the criteria for two of these circumstances, numbered one and three. She had an insanity defense and felt that a judge would have the experience and knowledge to understand the many experts testifying at her trial. This case had extensive, inflammatory media exposure and Adams felt that she could not find a jury of her peers that had not heard of the case and formed an opinion. If Adams had realized that her defense attorney was proceeding with a jury trial despite her wishes, she would have at the very least demanded a change of venue. Instead, when jury

selection began and she attempted to question her attorney, HE TOLD HER TO BE QUIET.

This defendant contends and has shown repeatedly that her trial counsel failed in alerting her to matters of the court, and failed to have her transported on December 8, 2008, wherein it was decided, against her will, to proceed to a trial by jury. This suspended the defendant's due process rights, a clear violation of her *Sixth Amendment Rights*.

Appellant urges the Court to recognize that as with any mode that might be devised to determine guilt, trial by jury has its weaknesses and the potential for misuse. There are circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that a trial by jury would result in the denial to a defendant of an impartial trial. Adams argues that there were mitigating circumstances and she felt that passion, prejudice, public feeling, and lack of knowledge of the laws surrounding her case would render it impossible for her to receive a fair, impartial trial. These are the reasons that Adams felt very strongly about having a bench trial; however, this was circumvented by her own attorney.

Proceeding with a trial by jury not only violated Adams' rights but also prejudiced her. Had Adams went to trial by judge, the outcome of the trial would have been greatly different.

After reviewing the opinion published in the denial of this collateral review by the First Circuit Court of Appeal, Adams notes that the Court only addressed two of her issues. The fact that her defense attorney proceeded requested a trial by jury against her wishes was never addressed at all. The Court mentions the Failure to Suppress and Insufficient Evidence claims, but fails to address the fact that Ms. Adams was denied her right to be present at all pertinent court hearings and the fact that defense counsel went against her wishes to proceed with a judge trial. The 22nd Judicial Court stated that this was merely trial strategy and was a "judgment call" by the defense attorney, but the fact remains that it was not his call to make. Justice Hughes of the Louisiana First Circuit Court of Appeal dissented stating that he would have granted in part due to the fact that Ms. Adams requested a judge trial. She was prejudiced by her own defense attorney's decision to change that without consulting with her. Ms. Adams felt strongly about proceeding with a judge trial and had very valid reasons for her feelings, as stated above.

## ISSUE #3- DEFENSE COUNSEL ERRED WHEN THEY FAILED TO MAKE A MOTION TO SUPPRESS VIDEOTAPED CONFESSION ON GROUNDS OF INCOMPETENCY

When insanity is the basis of a motion to suppress a confession, the State must prove that defendant had the mental capacity to waive his right against self-incrimination. **La. Code Crim. Proc. Ann. art. 703 D**. Had this claim been raised properly, the State would not have been able to prove that Adams had the mental capacity to waive her right against self-incrimination. She was declared

incompetent and deemed not able to understand her rights by the trial court after the confession, and remained incompetent for two years.

The critical determination of an accused's capacity to stand trial is whether or not he is able to understand the proceedings and to assist in his own defense. Appropriate considerations in determining whether or not the accused is fully aware of the nature of the proceedings include whether or not he understands the nature of the charge and can appreciate its seriousness, whether or not he understands what defenses are available, whether or not he can distinguish a guilty plea from a not guilty plea and understand the consequences of each, **whether or not he has an awareness of his legal rights**, and whether or not he understands the range of possible verdicts and the consequences of conviction.

In denying Adams' motion to suppress, the trial court noted, "[a]t this time, I am going to find that what purports to be a confession has been shown to be freely and voluntarily made and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises." **THE COURT HAD NO CHOICE, AS THE MOTION TO SUPPRESS WAS RAISED INCORRECTLY.** Defense counsel erred by not raising the motion to suppress for the reason of INCOMPETENCY. Adams was clearly incompetent when she gave her confession if she was declared so by the court at her sanity hearing soon after and remained incompetent until June of 2008.

41

It was Bolton's responsibility to assert all claims regarding her mental condition and/or the interrogation techniques on voluntariness of the statements performed by law enforcement officials.  It was Bolton's responsibility to bring forth to the trial court that his client was mentally ill and on several medications and should not have been interrogated by law enforcement officials until she was not intoxicated, mentally competent, and able to understand her rights.

Bolton made a Motion to suppress the statement and was denied because he did not raise the claim using a valid reason that had merit, namely her intoxication, mental incompetency, police coercion, and her general lack of understanding. If Adams was deemed incompetent to stand trial and sent to a state facility to learn her rights, she was obviously incompetent when she gave her confession. Judge Hedges stated to Adams in open court that she did not believe that Adams knew her rights and was ordering her to take Legal Right classes. All of the experts who examined her agreed that Adams suffered from major depression and that she reported some paranoid symptoms. When Adams was interviewed, she had trouble putting her thoughts together and staying on topic. The tape showed that some questions had to be repeated and that Adams never answered all of the questions. Dr. Deland reviewed the videotaped confession and believed that someone suffering from a mental illness was more susceptible to suggestions than a normal person. Improper techniques and leading questions were used for a significant

length of time before the video was set to record. Sgt. Tyson never put into his report that he had questioned Adams for a lengthy period of time prior to the recording beginning.

Adams was medicated and experiencing a mental breakdown. The Motion to Suppress would have had merit had Bolton argued: *Soon after Appellant's arrest, a Motion for a Sanity Hearing was granted. It was heard on January 31, 2007 and Appellant was declared incompetent to stand trial, the trial judge stated she did not understand her legal rights, and she was remanded to Feliciana Forensic Facility to undergo treatment and take Legal Rights classes. If Adams did not understand her legal rights up until June 4, 2008, when she was declared competent to stand trial, then how can she be held accountable for a statement that she waived her rights and made on December 5, 2005?*

Bolton's failure to make the motion to suppress correctly prejudiced Adams severely. Adams was convicted of second degree murder based on this evidence being introduced. She was clearly incompetent and the trial court held her incompetent, stating that she did not understand her rights. How can a confession that Adams' gave under duress at a time when she was not competent to understand be held against her? Adams' would have been found not guilty at the conclusion of this trial but for this catastrophic error by Bolton.

The **Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Louisiana Constitution** guarantee a defendant in a criminal prosecution the right to be represented by counsel, in **Powell v. Alabama,** 53 S.Ct. 55 (1932), the United States Supreme Court recognized that the right to counsel is the right to effective counsel. Since **Powell,** the Supreme Court has expanded the scope of that right to effective assistance of counsel. Indeed, the right may be a defendant's most fundamental right because it is essential to his or her ability to assert any other right he or she may have. **United States v. DeCoster**, 487 F.2d 1197 (DC Cir. 1973). Furthermore, the defendant is guaranteed that such counsel will serve effectively and competently, and will perform certain duties necessary to adequately represent his client's interest. To deny a defendant effective assistance of counsel has been viewed as akin to denying him any assistance at all.

Thus, when the counsel fails to properly assert and argue the Motion to Suppress, the error is so egregiously prejudicial that ineffective assistance of counsel should be presumed.

### ISSUE #4- DEFENSE COUNSEL ERRED WHEN THEY FAILED TO INVESTIGATE

There were irregularities in the protocol from the beginning when Sgt. Tyson questioned Adams. Were her statements voluntary? He Mirandized her from memory. Was this protocol? Sgt. Tyson admitted to leaving various information or details from his report. Important information or details? We know

that the police are not always forthcoming. It was Bolton's duty to investigate while preparing a case for Adams, to find out what the police couldn't find out or what they left out. The inconsistencies in Tyson's report versus his testimony at trial proved that he was not forthcoming. One of the many examples of this is the fact that Tyson placed Adams in the back of the police unit after mirandizing her from memory, refused to let her get out when she asked, and refused to allow her mother to speak with her. Adams was made to feel that she was under arrest, treated as if she was under arrest, and was not told she could leave if she chose to. In fact, she asked to be released from the car and was refused. At trial when cross-examined by defense attorney, Sgt. Tyson testified that Adams was not placed under arrest until after the video statement was recorded, and prior to that, was free to go at any time. This is one of many discrepancies between Tyson's report and his testimony.

Failure to investigate constitutes ineffective assistance of counsel. The **Sixth Amendment** imposes on counsel "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, 466 U.S. at 691*. Counsel has performed ineffectively "where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so." *Availa v. Galaza*, 297 F.3d 911, 918-919 (9th Cir. 2002) (quoting *Sanders v. Ratelle*, 21 F. 3d 1446, 1456 (9th Cir. 1994)).   Bolton

45

failed to investigate properly. If he had, he would have uncovered several material witnesses that would have changed the outcome of the trial considerably The Fourth Circuit in *Coles v. Peyton*, 389 F.2d 294 (4th Cir. 1968), first broke new ground overthrowing the older standard in favor of specific requirements which defense counsel must observe in the representation of his client. Importantly, adequate investigation is a central requirement.

The principles may be simply stated: Counsel for an indigent defendant should be appointed promptly. Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain the potential defenses that are unavailable. Counsel must conduct appropriate investigations, both factual and legal, to determine what matter of defense can be developed, and to allow himself enough time for reflection and preparation for trial; *U.S. v. Decoster*, 487 F.2d 1197. Thorough preparation demands that an attorney interview and prepare witnesses before they testify. No competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion. In fact, more than one lawyer has been punished, found ineffective, or even disbarred for incompetent representation that included failure to prepare or interview witnesses. *U.S. v. Rynes*, 218 F.3d 319; *U.S. v. Tucker*, 716 F.2d 576 (9th Cir. 1983)(defense counsel ineffective for failing to interview witnesses); *In re Warmington*, 212 Wis.2d 657, 668 568

46

N.W.2d 641 (1997)(lawyer disbarred for, among other things, "failure to supervise the preparation of an expert witness"); *In re Wolfram*, 174 Ariz. 49, 847 P.2d 94, 96 (1993)(failure to interview witnesses cited among reason for suspending attorney).

Appellant is entitled to reversal of her conviction and sentence and a new trial ordered; she is also requesting the Court to grant an evidentiary hearing so that Appellant can produce additional, factual determinations that are essential to prove that counsel's representation was ineffective and how the representation destroyed petitioner's rights and prejudiced the outcome of her case.

Adams is not proposing that Bolton failed on filing a few minor motions; he made major errors that ultimately prejudiced her case severely. Adams' spoke to Bolton prior to trial about the three physicians that she sought out when she was attempting to obtain help for her progressing mental deficiencies; Bolton failed to speak to them or call them as witnesses at the trial to prove that Adams' was crying out for help. See *Moore v. Johnson*. Bolton was fully aware from speaking to Adams family that she had changed considerably and they noticed marked changes in her behavior since the birth of her son. Adams had been experiencing problems for some time, and it is safe to say it did not come quickly, but was over time; she was unstable and attempted to find the proper medical attention. Bolton should have sought out healthcare officials to fully diagnosis the perimeters of Adams'

47

mental illness. It is evident by the testimony given during the sanity commission that Adams suffered some sort of psychosis and mental disorder and her attorney should have sought the proper help for Adams and the correct avenue in which to defend the rights of a mentally impaired individual. Adams' had reported that she had been sexually molested at an early age by a male cousin from the age of three until she was approximately fifteen years of age. When she finally found the strength to tell a social worker at her high school, her family refused to believe her. This contributed greatly to the major depression Adams was still experiencing some time later.

In failing to investigate, Bolton prejudiced Adams extensively. The outcome of the trial would have differed greatly if only he had taken the time to research witnesses, question doctors Adams had visited regularly, and questioned the testimony of the State's witnesses to an extent that he required documentation to corroborate their testimony. Adams could have provided evidence to support the fact that on at least three separate instances, she sought help because she and her family realized that her own mental health was deteriorating. There are three doctors who could have testified that Adams reached out for help and she received none, not even a simple referral to a mental health doctor.

Bolton was asked to provide a copy of the case file in which he used to defend the rights of Adams. In that file there was very little in the way of evidence

to prove or provide that Bolton had indeed worked for Adams best interest. As said before it is every defendant's right to have the best legal representation even if they are appointed counsel for an indigent offender who is mentally incompetent.

## CONCLUSION

Petitioner requests that this Honorable Court review these claims again with an open mind. Ms. Adams was denied effective assistance of counsel to the point that it prejudiced her severely. The Jury/Judge trial claim alone warrants reversal of her sentence. Due to the fact that defense counsel was ineffective, the video-taped confession was admitted into evidence when it would not have been if objected to correctly. Ms. Adams was eighteen years old when she was arrested, and she has been sentenced to spend the remainder of her life in prison. She does not argue the fact that a debt to society should be paid, but a life sentence for a crime that was never intended or planned is harsh; she was delusional and has since regained a measure of herself. Due to the mitigating circumstances, namely her post-partum depression and post-traumatic stress syndrome that the experts agreed on, she argues that rehabilitation is prospective and a sentence of life imprisonment without the possibility of parole is excessive. The element of Second Degree Murder relates intent to kill; Ms. Adams avers that she never had any intent to harm her son. She loved her son; she was very sick at the time and did not understand the consequences of her actions.

**WHEREFORE,** Petitioner respectfully moves that this Court enter an order as follows:

Granting such relief as justice may require, including but not limited to: reversal of her conviction for second degree murder, vacation of her life sentence, and remand to the Twenty-Second Criminal District Court for retrial, or failing this remedy, granting Petitioner an evidentiary hearing in the judicial district court as provided by law in order to resolve the questions of fact described herein.

This the 18 day of December , 2012.

Respectfully submitted,

Lakeisha Shanae Adams # 551775
Louisiana Correctional
Institute for Women
Post Office Box 26
Saint Gabriel, Louisiana 70776

## CERTIFICATE OF SERVICE

**STATE OF LOUISIANA**
**PARISH OF IBERVILLE**

I, hereby certify that I have forwarded a copy of the above Petition For Writ

Of Habeas Corpus Under 28 U.S.C. § 2254 By A Person In State Custody and,

Memorandum Of Law And Authorities In Support Of Petitioner's Writ Of Habeas

Corpus has been mailed to Walter P. Reed, District Attorney, 701 N. Columbia

Street, Covington, Louisiana 70433, by the U.S. Postal Service, properly addressed

and pre-paid postage on this ___18___ day of November, 2012.

La'Keisha Adams

51

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X] This brief contains [13,672] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ] this brief has been prepared in a proportionally spaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style], or

[X] this brief has been prepared in a monospaced typeface using [Microsoft Word 2001] in [Times New Roman, 14 font].

La'Keisha Adams

Dated: December 18, 2012

# APPENDIX

## APPENDIX

Indictment for Lakeisha Shanae Adams ................................................ **Exhibit 1**

Commitment of Lakeisha Shanae Adams ............................................ **Exhibit 2**

Statement by the Clerk C.Cr.P. Art. 892 ............................................... **Exhibit 3**

22nd Judicial District Court Minutes from August 11, 2008 .................. **Exhibit 4**

22nd Judicial District Court Minutes from December 8, 2008 ............... **Exhibit 5**

Supreme Court Decision, Direct Appeal ............................................... **Exhibit 6**

Application for Post-Conviction Relief ................................................ **Exhibit 7**

Order for Answers issued by 22nd Judicial District Court ..................... **Exhibit 8**

District Attorney's Answer to Petition for Post-Conviction Relief ....... **Exhibit 9**

Order with Reasons issued by 22nd Judicial District Court ................. **Exhibit 10**

First Circuit Court of Appeal's Denial w/ dissent ............................... **Exhibit 11**

Louisiana Supreme Court's Denial ...................................................... **Exhibit 12**

Louisiana Supreme Court's Denial for rehearing ............................... **Exhibit 13**

Correspondence to Barry Bolton .......................................................... **Exhibit 14**

Ethical Conduct Complaint ................................................................. **Exhibit 15**

Complaint for District Attorney File and Public ................................. **Exhibit 16**

Motion to Obtain Public Records filed March 16, 2011 ...................... **Exhibit 17**

Motion for Contradictory Hearing filed February 2, 2011 ................. **Exhibit 18**

Motion for Production of Documents filed February 2, 2011 ............. **Exhibit 19**

Denial of Application for Production of Documents ........................... **Exhibit 20**

Letter from Appellate Project Attorney .............................................. **Exhibit 21**

Time Line ........................................................................................... **Exhibit 22**