## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LAKEISHA SHANAE ADAMS** | **CIVIL ACTION** |
| **versus** | **NO. 12-3046** |
| **JAMES ROGERS, WARDEN** | **SECTION: "B" (1)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Lakeisha Shanae Adams, is a state prisoner incarcerated at the Louisiana Correctional Institute for Women, St. Gabriel, Louisiana.  On March 14, 2009, she was convicted

of second degree murder under Louisiana law.[1]  On March 25, 2009, she was sentenced to a term

of life imprisonment without benefit of parole, probation, or suspension of sentence.[2]  On May 7,

2010, the Louisiana First Circuit Court of Appeal affirmed her conviction and sentence.[3]  The

Louisiana Supreme Court then denied her related writ application on January 7, 2011.[4]

On or about December 29, 2011, petitioner filed an application for post-conviction

relief with the state district court.[5]  That application was denied on February 27, 2012.[6]  Her related

writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on June 4,

2012,[7] and by the Louisiana Supreme Court on November 2, 2012.[8]

---

[1]  State Rec., Vol. VII of XI, transcript of March 14, 2009, p. 109; State Rec., Vol. I of XI, minute entry dated March 14, 2009; State Rec., Vol. I of XI, jury verdict form.

[2]  State Rec., Vol. VII of XI, transcript of March 25, 2009; State Rec., Vol. I of XI, minute entry dated March 25, 2009.

[3]  State v. Adams, No. 2009 KA 2015, 2010 WL 1838308 (La. App. 1st Cir. May 7, 2010); State Rec., Vol. VIII of XI.

[4]  State v. Adams, 52 So.3d 885 (La. 2011) (2010-KO-1375); State Rec., Vol. VIII of XI.

[5]  State Rec., Vol. VIII of XI.

[6]  State Rec.,Vol. VIII of XI, Order with Reasons dated February 27, 2012.

[7]  State v. Adams, No. 2012 KW 0504 (La. App. 1st Cir. June 4, 2012); State Rec., Vol. VIII of XI.

[8]  State ex rel. Adams v. State, 99 So.3d 665 (La. 2012) (No. 2012-KH-1408); State Rec., Vol. VIII of XI.  The Louisiana Supreme Court also denied petitioner's request for reconsideration on December 14, 2012.  State ex rel. Adams v. State, 104 So.3d 429 (La. 2012) (No. 2012-KH-1408); State Rec., Vol. VIII of XI.

Petitioner subsequently filed the instant federal application seeking *habeas corpus* relief.[9]  The state filed a response in which it conceded that the application was timely but argued that petitioner's claims were either procedurally barred or lacked merit.[10]  Since the state's response was filed, petitioner has supplemented and amended her federal application on two occasions.[11]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct, and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant

---

[9] Rec. Doc. 4.

[10]  Rec. Docs. 15 and 16.

[11]  Rec. Docs. 18, 19, 20, and 21.

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the

> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary
> conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was
> meant to be.  As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings.  It preserves authority to issue
> the writ in cases where there is *no possibility* fairminded jurists could
> disagree that the state court's decision conflicts with this Court's
> precedents.  It goes no farther.  Section 2254(d) reflects the view that
> habeas corpus is a guard against *extreme malfunctions* in the state
> criminal justice systems, *not a substitute for ordinary error
> correction through appeal*.  *As a condition for obtaining habeas
> corpus from a federal court, a state prisoner must show that the state
> court's ruling on the claim being presented in federal court was so
> lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 779, 1866 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts

of this case as follows:

> This case involves the brutal killing of three-month-old,
> J.A.[FN1], at the hands of his mother, the eighteen-year-old
> defendant.  As shown at trial, on December 5, 2005, the defendant
> placed J.A. inside the clothes dryer at her home and turned it on.  The
> child died as a result of blunt force head trauma and thermal injuries,
> as the infant also sustained second and third-degree burns over fifty
> percent of his body.
>
> > [FN1] In accordance with LSA-R.S. 46:1844(W), the
> > infant victim is referenced only by his initials.
>
> The testimony and evidence at the defendant's trial established
> the following:
> On December 5, 2005, at approximately, 6:50 p.m., the
> defendant called 911 and advised that someone broke into her home
> and killed her infant son.  Officers from the Bogalusa Police
> Department were dispatched to the defendant's Roosevelt Street
> residence to investigate.  When the officers arrived, they found the
> defendant standing in the street, hysterical.  The defendant told the
> officers she momentarily exited the residence to take out some trash
> and two unidentified males entered the residence and locked the door.
> She claimed she did not regain entry into the residence until
> approximately twenty minutes later.  At that time, she claimed she
> learned that the men had placed J.A. inside the clothes dryer.  The
> officers found the body of three-month-old J.A. propped up on a sofa
> inside the residence.  The child's body was covered with thermal
> injuries.  The injuries were red in color and had heat radiating from

them.  A large bloodstained comforter was found inside the dryer and the dryer's lint filter contained pieces of human skin.

Upon conversing with the defendant again, the investigating officers noted what they believed to be inconsistencies in her story. The officers also noted that although she acted hysterically, the defendant was not actually crying any tears.  The officers began to doubt the defendant's story and her sincerity.  The defendant was later read her <u>Miranda</u> rights and taken to the police headquarters for questioning.  At the station, the defendant again claimed that the unidentified men locked her out of the house and killed her baby before fleeing.  The investigating officers advised the defendant that her story did not add up and asked that she tell the truth.  The defendant stated, "my family is going to hate me."  Thereafter, the defendant provided a videotaped statement to the authorities.  The videotape, admitted into evidence and played for the jury at the trial, recorded the defendant calmly admitting that she placed J.A. inside the clothes dryer to calm him and quiet his crying.  The defendant claimed she had done this to the infant at least once before.  The defendant was arrested and indicted with murder.

At the trial, Eugene Montrel Jones testified that he was J.A.'s father.  He explained that he and the defendant had been involved in a relationship.  Jones admitted that he also was involved in a relationship with Zenaida Franklin at the same time.  Jones claimed he loved both women.  Around the same time in 2005, both the defendant and Franklin became impregnated by Jones.  Jones went back and forth, spending time with both women.  Both women lived in Bogalusa at the time.  These shared relationships ultimately caused friction between the defendant and Zenaida.  The women were very hostile towards one another and were involved in many physical fights.  Eventually, Zenaida left Bogalusa and moved to Baton Rouge.

According to Jones, the defendant gave birth to J.A. first. J.A. was born approximately two months premature.  After J.A.'s birth, Jones and the defendant were together in Bogalusa.  Later, on December 1, 2005, Zenaida gave birth to her baby in Baton Rouge. On December 5, 2005, Jones left Bogalusa and traveled to Baton Rouge to be with Zenaida and his other child.  Jones testified the defendant was not pleased with his decision.  She repeatedly called Jones on his cellular phone and asked why he was in Baton Rouge. According to Jones, the defendant was jealous because she knew he was in Baton Rouge with Zenaida.  She wanted him to return to Bogalusa.  Jones testified he told the defendant that Zenaida had

given birth to a baby for him also and it was time for him to be with her. Jones claimed that because the defendant kept calling and "aggravating" him, he eventually turned his phone off. Later, when he turned the phone back on, the defendant called and stated that someone put J.A. in the dryer.

Franklin testified she overheard the phone calls the defendant made to Jones on the day in question. According to Franklin, the defendant called once and told Jones something was wrong with J.A. Approximately 35 to 40 minutes later, the defendant called and said the baby was dead. Franklin also confirmed the violent relationship that existed between herself and the defendant. She admitted to stabbing the defendant once and stated the defendant ran over her with a vehicle.[12]

### III.  Petitioner's Claims

### A.  Denial of Records

Petitioner's first claim is that she has been denied copies of transcripts and the district attorney's file, a denial which she claims adversely affected her ability to seek relief on direct and collateral review.

Petitioner's contention that her ability to seek *collateral* relief was adversely affected simply is not cognizable in this proceeding. Jones v. Boyd, No. 2:08-CV-476, 2008 WL 2951877 (M.D. Ala. July 30, 2008) (finding that a petitioner's claim that he was denied a copy of his criminal trial transcript for use in filing a post-conviction application was not cognizable under § 2254; noting "it is well established that an indigent defendant does not have a constitutional right to a free copy of his transcript or other court records for use in a collateral proceeding"); see Smith v. Lempke, No. 08-CV-6065, 2010 WL 2629794, at *11-12 (W.D.N.Y. June 28, 2010) ("To the extent

---

[12] State v. Adams, No. 2009 KA 2015, 2010 WL 1838308, at *1-2 (La. App. 1st Cir. May 7, 2010); State Rec., Vol. VIII of XI.

that petitioner argues he was deprived of transcripts and therefore could not file a § 440.10 or *coram nobis* application, the Supreme Court has not held that a criminal defendant is entitled to free transcripts to pursue collateral relief in state court."); see also Colbert v. Beto, 439 F.2d 1130, 1131 (5th Cir. 1971) ("[A]n indigent does not have a federally-protected right to a free copy of his transcript or other court records merely to search for possible error in order to file a petition for collateral relief at some future date.").  On the contrary, it is clear that a federal *habeas* court "must find constitutional error *at the trial or direct review level* in order to issue the writ."  Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (emphasis added).  Therefore, even if petitioner's ability to seek *collateral* review was adversely impacted by the denial of records, that cannot serve as a basis for relief under § 2254.

On the other hand, a claim that the denial of transcripts prevented a petitioner from seeking meaningful *direct* review is cognizable under § 2254.  See, e.g., Griffin v. Illinois, 351 U.S. 12, 19-20 (1956) (holding that the Due Process and Equal Protection clauses of the Fourteenth Amendment require that states provide indigent defendants with a trial transcript free of charge when it is necessary for meaningful appellate review).  However, the state argues that this Court should not consider petitioner's claim raising this issue because the state courts rejected the claim on procedural grounds.  For the following reasons, the state is correct.

The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must

"clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

Here, there is no question that petitioner's claim was denied by the state courts on procedural grounds. When petitioner first asserted this claim in the state post-conviction proceedings, the state district court denied relief on the basis that the claim was a matter "which should have been addressed on direct appeal."[13]  Although the Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court then denied petitioner's related writ applications without assigning additional reasons,[14] "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground." Finley, 243 F.3d at 218.

Clearly, the procedural rule on which the state courts relied was "independent" and "adequate." Federal courts have repeatedly and consistently held that Louisiana's rule that a claim regarding an appealable issue is waived if not asserted on direct appeal is an independent and adequate state court rule to support a procedural bar in federal court. See, e.g., Hurd v. Cain, Civ. Action No. 09-3112, 2009 WL 3063354, at *7 (E.D. La. Sept. 23, 2009); Simms v. Cain, Civ. Action No. 07-966, 2008 WL 624073, at *27 (E.D. La. Mar. 4, 2008); Dorsey v. Louisiana, Civ. Action No.

---

[13]  State Rec.,Vol. VIII of XI, Order with Reasons dated February 27, 2012.

[14]  State v. Adams, No. 2012 KW 0504 (La. App. 1st Cir. June 4, 2012); State ex rel. Adams v. State, 99 So.3d 665 (La. 2012) (No. 2012-KH-1408); State Rec., Vol. VIII of XI.

07-036, 2007 WL 1747014, at *4 (E.D. La. June 15, 2007); Hill v. Cooper, Civ. Action No. 04-2588, 2007 WL 458207, at *7 (E.D. La. Feb. 8, 2007); Stevenson v. Cain, Civ. Action No. 06-1244, 2006 WL 2850167, at *14 (E.D. La. Oct. 4, 2006).

Where, as here, the state courts have rejected a petitioner's claim based on an independent and adequate state procedural rules, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted).  Petitioner has made no attempt in the instant case to establish cause.  "Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

Because petitioner has not met the "cause and prejudice" test, this Court need consider her claim only if the application of the procedural bar would result in a "fundamental miscarriage of justice."  However, in order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him.  Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."  Finley, 243 F.3d at 220 (citations omitted).

Petitioner has not made that showing in this case.[15]  Therefore, she has not established that any

miscarriage of justice will result from the application of the procedural bar.[16]

_____

[15]  On the contrary, petitioner seems to acknowledge that she did in fact kill her son.  See, e.g., Rec. Doc. 4, p. 70.

[16]  In any event, even if petitioner's claim is considered on the merits, it is evident that she has not established that she is entitled to relief.  For example, her contention that she is entitled to a "complete transcript of all proceedings" is simply incorrect.  As the United States Fifth Circuit Court of Appeals has explained:

> In Griffin v. Illinois, 351 U.S. 12, 19-20, 76 S.Ct. 585, 100 L.Ed. 891 (1956), the Supreme Court held that the Due Process and Equal Protection clauses of the Fourteenth Amendment require that states provide indigent defendants with a trial transcript free of charge when it is necessary for meaningful appellate review. However, the state is not obligated to automatically supply a complete verbatim transcript, and a State need not waste its funds providing for free those parts of the transcript that are not germane to consideration of the appeal.  Nor is the state required to furnish complete transcripts so that the defendants may conduct fishing expeditions to seek out possible errors at trial.

Kunkle v. Dretke, 352 F.3d 980, 985-86 (5th Cir. 2003) (internal citations, quotation marks, brackets, and ellipsis omitted).  Here, petitioner alleges that "[h]ad [she] possessed all of the transcripts she would have proven beyond a shadow of a doubt that her constitutional rights were violated and that is not guilty of the second-degree murder."  Rec. Doc. 4, p. 28.  That allegation, however, is wholly conclusory, and she has not identified any specific claim that she was unable to pursue on direct appeal due to the lack of a transcript.  In the absence of any such specificity, relief clearly would not be warranted.  See id. at 986 (rejecting as insufficient petitioner's general allegations that "he may have been able to uncover an error of constitutional magnitude had he been provided a complete transcript"); see also Johnson v. Cooper, Civ. Action No. 11-1382, 2013 WL 4548526, at *7-8 (E.D. La. Aug. 27, 2013).

    Moreover, it must further be noted that petitioner was represented by counsel on appeal. There is no suggestion that counsel was not furnished with copies of the necessary transcripts, and a review of counsel's appeal brief in fact contains citations to the transcript.  See State Rec., Vol. IX of XI, Original Brief filed by Margaret S. Sollars of the Louisiana Appellate Project.  Clearly, appellate counsel was in the best position to judge whether the record provided to her was adequate for the purposes of appeal, and petitioner does not claim that her appellate counsel rendered ineffective assistance of counsel by failing to raise a particular claim on appeal.  Further, even assuming that petitioner would have preferred to have been able to "assist" her appellate counsel, petitioner had no federal constitutional right to represent herself on appeal or to engage in hybrid

<u>B.  Involuntary Confession</u>

Petitioner's next claim is that her confession should have been suppressed because she was in a "delusional state" when it was given and because she had been subjected to "improper questioning techniques by the police."[17]  The state argues that this claim is likewise procedurally barred.  Again, the state is correct.

On direct appeal, the Louisiana First Circuit Court of Appeal rejected this claim on procedural grounds, holding:

> [T]he defendant argues the trial court erred in failing to suppress her confession.  She argues the state failed to carry its burden of proving that the confession was free and voluntary and of proving a knowing and intelligent waiver of her rights under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  Specifically, the defendant asserts that her delusional mental state and the improper questioning techniques employed by the investigating officers vitiated any voluntariness on her part.  In response, the state asserts the defendant failed to raise this issue in connection with her motion to suppress filed below and, thus, she is precluded from raising the issue for the first time on appeal.  Alternatively, the state contends the record is clear that the defendant's confession was free and voluntary and that she knowingly and intelligently waived her rights.
>
> Initially, we note that the state is correct in its assertion that the defendant failed to raise the issue of her mental condition at the time of the statement in her motion to suppress.  The record reflects that the defendant's motion asserted that her confession was inadmissible because it was made "under the influence of fear, duress, intimidation, menaces, threats, inducements, and promises and/or without mover having been advised of her rights to remain silent, right to counsel and other rights and protections afforded under the Federal and State Constitutions...."  The motion is devoid of any

representation on appeal.  <u>See, e.g.</u>, <u>United States v. Cockerham</u>, 396 Fed. App'x 66, 67 (5th Cir. 2010).

[17]  Rec. Doc. 4, p. 31.

reference to the involuntariness of the confession based upon the defendant's mental condition.

At the hearing on the motion to suppress, the defendant's mental condition at the time of the statement was not at issue. The main issue raised was whether the statement was freely and voluntarily given in compliance with LSA-R.S. 15:451 and Miranda. Lieutenant Donald Ray Phelps, of the Bogalusa Police Department, testified that the defendant initially advised that some men broke into her house and killed her baby. Lt. Phelps explained that the defendant's sincerity was questionable because, although she appeared to be crying, no tears were observed. The defendant was eventually transported to police headquarters for questioning. Prior to giving a statement, the defendant was advised of her Miranda rights using an "Interrogation Advice of Rights" form. According to Lt. Phelps, the defendant voluntarily waived her rights and executed the rights-waiver document. Lt. Phelps testified that no promises, inducements, or force was used in connection with the defendant's confession. He explained that the defendant was advised that her story regarding someone else coming into the home and injuring her baby was not adding up. She was urged to tell the truth. Thereafter, the defendant freely and voluntarily confessed to placing J.A. inside the dryer and turning it on. She explained that she was watching a movie with her daughter, C.A., and J.A. was crying. The defendant claimed she left the baby in the dryer for an undisclosed amount of time before taking his body out and sitting him up on the sofa. She also claimed that she had taken several different types of medication that day.

Captain Joe Culpepper, also of the Bogalusa Police Department, testified that he was present when the defendant gave the videotaped confession. He stated the defendant was never threatened, coerced, or promised anything in exchange for her confession. Once the officers advised the defendant that her initial account of the events contained inconsistencies, the defendant changed the story. The defendant freely and voluntarily provided the statement wherein she indicated she put her baby in the dryer to calm him. She also admitted that she had done this once before. Captain Culpepper further explained that although he had learned that the defendant had been somewhat hysterical when the police initially arrived on the scene, by the time of the statement she appeared to be "very calm."

In the videotaped statement, prior to answering any questions regarding the events leading up to J.A.'s death, the defendant

acknowledged that she had been advised of her rights with an "Interrogation Advice of Rights" form. She confirmed that the form had been read to her, acknowledged her comprehension of the rights contained in the form and indicated she wished to waive said rights.

In denying the motion to suppress, the trial court noted, "[a]t this time, I am going to find that what purports to be a confession has been shown to be freely and voluntarily made and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises."

As the state correctly notes, the defendant's motion to suppress the confession did not include any assertions regarding the effect of her mental condition and/or the interrogation techniques on the voluntariness of the statement. Neither of these particular grounds were articulated by the defendant or addressed by the state during the hearing. The record reflects, and the defendant acknowledges, "[t]he idea of mental illness did not even come into play" at the hearing on the motion to suppress. This new basis for the motion to suppress has been raised for the first time on appeal. LSA-C.Cr.P. art. 703(F). It is well settled that a new basis or ground for the motion to suppress cannot be articulated for the first time on appeal. The articulation on appeal of a new basis or ground for suppression is prohibited under the provisions of LSA-C.Cr.P. art. 841, as the trial court would not be afforded an opportunity to consider the merits of the particular claim. See State v. Cressy, 440 So.2d 141, 142-43 (La. 1983). Thus, the defendant herein is precluded from raising a new basis for her motion to suppress on appeal.[18]

The Louisiana Supreme Court then denied her related writ application without assigning additional reasons.[19] Again, because the Louisiana Supreme Court assigned no reasons, it is presumed that it

---

[18] Adams, 2010 WL 1838308, at *3-4; State Rec., Vol. VIII of XI. This Court notes that the Court of Appeal also alternatively found that the claim was meritless. Adams, 2010 WL 1838308, at *4-5; State Rec., Vol. VIII of XI. However, that alternative finding is of no moment in determining whether the claim is procedurally barred, because it is clear that "[a] state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim." Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).

[19] State v. Adams, 52 So.3d 885 (La. 2011) (2010-KO-1375); State Rec., Vol. VIII of XI.

also rejected the claim on that same procedural ground.  <u>Finley v. Johnson</u>, 243 F.3d 215, 218 (5th Cir. 2001) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.").

Clearly, therefore, the state courts rejected this claim on the procedural ground that petitioner was attempting to raise on appeal new bases for suppression which were not first presented to the trial court.  Louisiana state courts have in fact long invoked that rule.  <u>See, e.g.</u>, <u>State v. Bass</u>, 595 So.2d 820, 823 (La. App. 2nd Cir. 1992) ("The defense has the burden of asserting the basis for its motion to suppress.  The state is entitled to adequate notice so that it will have an opportunity to present evidence and address the issue.  Defendant is limited on appeal to the grounds articulated at trial.  A new basis, even if meritorious, cannot be raised for the first time on appeal." (citation omitted)); <u>see also</u> <u>State v. Aymond</u>, 8 So.3d 795, 802-03 (La. App. 3rd Cir. 2009) (same). Further, the rule unquestionably meets the "independent" and "adequate" requirements for an enforceable procedural bar.  This procedural rule is obviously independent of the merits of the underlying federal claim.  As for the rule's adequacy, "[t]he [procedural bar] doctrine presumes that a state procedural ground is adequate ... and, ordinarily, the burden is on the habeas petitioner to demonstrate otherwise."  <u>Hughes v. Johnson</u>, 191 F.3d 607, 614 (5th Cir. 1999).  In order to establish that a state procedural rule is not "adequate," a petitioner bears the burden of showing that the state failed to strictly or regularly follow the procedural rule.  <u>Stokes v. Anderson</u>, 123 F.3d 858, 860 (5th Cir. 1997).  Here, petitioner has made no attempt whatsoever to establish that the rule was not strictly or regularly followed.  Moreover, as indicated by the Court of Appeal's citation to La.

Code Crim. P. art. 841, the rule at issue is akin to Louisiana's "contemporaneous objection" rule, which the United States Fifth Circuit Court of Appeal has long held to be an independent and adequate state procedural rule.  Duncan v. Cain, 278 F.3d 537, 541-43 (5th Cir. 2002).

In light of the foregoing, federal *habeas* review of this claim is likewise barred "unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999).  Again, she demonstrates neither.

In the instant case, petitioner appears to argue that her "cause" for the default was counsel's ineffectiveness in failing to file a pretrial motion to suppress the confession based on the new grounds first argued on appeal.  However, as explained in detail later in this opinion, petitioner's contention that her counsel was ineffective in this respect has no merit,[20] and it is clear that a meritless ineffective assistance of counsel claim cannot serve as cause for a procedural default. Sherrill v. Hargett, 184 F.3d 1172, 1176 (10th Cir. 1999); Turner v. Compoy, No. 91-55842, 1993 WL 425372, at *3 n.2 (9th Cir. Oct. 19, 1993); Arita v. Cain, Civ. Action No. 11-636, 2011 WL 4738666, at *11 (E.D. La. Aug. 25, 2011), adopted, 2011 WL 4738658 (E.D. La. Oct. 6, 2011), aff'd, 500 Fed. App'x 352 (5th Cir. 2012), cert. denied, 133 S.Ct. 1828 (2013); Bridges v. United States, No. 04 Civ. 2715, 2005 WL 1798084, at *2 (S.D.N.Y. Aug. 1, 2005); Davie v. Mitchell, 324 F. Supp. 2d 862, 872 (N.D. Ohio 2004); McLaughlin v. Carroll, 270 F. Supp. 2d 490, 516 (D. Del. 2003).  Because the purported ineffectiveness of counsel cannot serve as cause for the default of this claim, and because petitioner has established no other cause for default, the Court need not consider

---

[20] See pages 37-39, *infra*.

whether actual prejudice would result from the application of the procedural bar.  <u>Martin v. Maxey</u>, 98 F.3d 844, 849 (5th Cir. 1996) ("Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice.").

In that petitioner has not met the "cause and prejudice" test, this Court should consider this claim only if the application of the procedural bar would result in a "fundamental miscarriage of justice."  However, as noted *supra*, to establish that there would be a "fundamental miscarriage of justice," petitioner must make a persuasive showing that she is actually innocent. <u>Finley</u>, 243 F.3d at 220.  As already explained with respect to the preceding claim, she has not made that showing in the instant case.

For all of these reasons, the state is correct in arguing that this claim is procedurally barred in this federal proceeding and, therefore, should not be considered on the merits.

C.  Sufficiency of the Evidence

Petitioner next claims that there was insufficient evidence to support her conviction. With respect to this claim, she first argues that the evidence was insufficient because it showed that she was in fact insane at the time the offense was committed.  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant argues the evidence was insufficient to convict her of second degree murder because the preponderance of the evidence established she was delusional and insane at the time of the commission of the offense.
> In Louisiana, a jury considering a defendant's dual plea of not guilty and not guilty by reason of insanity must first determine whether the state has proved the essential elements of the charged offense beyond a reasonable doubt.  If the state meets its traditional burden of proof beyond a reasonable doubt, the defendant then bears the burden of establishing that he was insane at the time of the

- 18 -

offense and, therefore, exempt from criminal responsibility.  State v. Williams, 2001-0944, p. 4 (La.App. 1st Cir. 12/28/01), 804 So.2d 932, 938, writ denied, 2002-0399 (La. 2/14/03), 836 So.2d 135.

The standard of review for the sufficiency of evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt.  See LSA-C.Cr.P. art. 821; State v. Pizzalato, 93-1415, p. 17 (La.App. 1st Cir. 10/7/94), 644 So.2d 712, 721, writ denied, 94-2755 (La. 3/10/95), 650 So.2d 1174.  The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  When analyzing circumstantial evidence, LSA-R.S. 15:438 provides the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence.  State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La. 1988).

Louisiana Revised Statute 14:30.1(A)(1) defines second degree murder as follows:

> A. Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]

Thus, to support the conviction for second degree murder, the state was required to show:  1) the killing of a human being; and 2) that the defendant had the specific intent to kill or inflict great bodily harm.  State v. Morris, 99-3075, p. 13 (La.App. 1st Cir. 11/3/00), 770 So.2d 908, 918, writ denied, 2000-3293 (La. 10/12/01), 799 So.2d 496, cert. denied, 535 U.S. 934, 122 S.Ct. 1311, 152 L.Ed.2d 220 (2002).

In the instant case, the defendant does not contest that the evidence was sufficient to establish second degree murder, absent a finding that she was insane at the time of the offense.  However, the defendant insists that the evidence of her history of mental illness (severe depression), together with the expert testimony regarding the additional diagnosis of postpartum depression and/or posttraumatic-stress disorder, proved that she lost touch with reality during the time that she placed her infant son in the clothes dryer.

The defendant argues that she met her burden of proof at trial and the jury acted irrationally in convicting her of second degree murder.

In Louisiana, a legal presumption exists that a defendant is sane and responsible for his actions at the time of an offense. See LSA-R.S. 15:432; State v. Harris, 99-0820, p. 6 (La.App. 1st Cir. 2/18/00), 754 So.2d 304, 308. Thus, the state is not required to offer any proof of the defendant's sanity. State v. Harris, 99-0820 at p. 6, 754 So.2d at 308. To rebut the presumption of sanity and avoid criminal responsibility, a defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. See LSA-C.Cr.P. art. 652. Moreover, criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted from criminal responsibility, a defendant must show he suffered a mental disease or mental defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. LSA-R.S. 14:14; State v. Silman, 95-0154, p. 7 (La. 11/27/95), 663 So.2d 27, 32. The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and actions before and after the crime, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. See State v. Silman, 95-0154 at p. 7, 663 So.2d at 32.

At the trial of this matter, the state presented the testimony of Dr. John W. Thompson, Jr., an expert in the field of forensic psychiatry. Dr. Thompson initially evaluated the defendant as part of the sanity commission and later to determine her sanity at the time of the offense. On the issue of the defendant's sanity at the time of the commission of the offense, Dr. Thompson testified that the defendant suffered from a mental disease, major depression. However, Dr. Thompson was of the opinion that the defendant's depressive condition did not rise to the level where she could not distinguish between right and wrong. The determination of the defendant's appreciation of the wrongfulness of her actions was based upon the inconsistencies in the defendant's accounts of the events (*i.e.*, her attempt to cover up her involvement in the matter), the absence of delusional and/or fixed false beliefs, and the absence of a psychotic motive (*i.e.*, instead, the defendant was frustrated because J.A. was crying). These actions, Dr. Thompson noted, are inconsistent with experiencing psychotic depression or depression that forces one to lose touch with reality. Instead, the defendant's actions indicate a non-psychotic motive. He explained that the

defendant was frustrated or overwhelmed with the situation she was in with the child's father and she chose to use a "primitive method" of attempting to get the baby to stop crying.

The state also presented the testimony of Dr. Charles P. Vosburg and Dr. Herbert W. "Terry" LeBourgeois, both accepted as experts in forensic psychology. Drs. Vosburg and LeBourgeois each testified that the defendant met the first criteria for insanity defense because she had a diagnosable mental illness, major depressive episode. Dr. LeBourgeois also concluded the defendant met the criteria for posttraumatic-stress disorder in response to an earlier life-threatening stabbing by Franklin. Both doctors found that the defendant was under a tremendous amount of stress after the birth of her second child and was likely affected by postpartum depression and stress associated with her dealings with Franklin. However, the defendant did not experience delusions or fixed false beliefs. Both experts noted that although, she reported past hallucinations, the defendant denied any hallucinations on the date of the killing. Each expert was of the firm opinion that the defendant was able to distinguish between right and wrong at the time she committed the offense in question. The defendant's depressed mental condition did not result in her losing touch with reality at the time of the incident. Instead, the doctors opined, her actions resulted from poor judgment in a stressful situation, not from any psychosis.

In support of her insanity defense, the defendant presented lay testimony from her mother, grandmother, aunt, high school teacher, high school guidance counselor, and several friends to establish a history of mental illness. Kerry Berry testified that the defendant was living with her when she became pregnant with J.A., her second child. The defendant, an otherwise happy individual, became obviously depressed. She isolated herself and refused to interact with Berry. Berry explained the defendant's abnormal behavior made her feel "uncomfortable" in her own home. Berry further explained that despite her change in behavior, the defendant had a good relationship with her children. She cared for her children and was never observed abusing them. Berry was surprised to learn that the defendant had placed her infant son in the dryer, as this was inconsistent with the way the defendant had cared for her children.

Karen Williams, another friend of the defendant, testified she also observed a change in the defendant's personality after she became pregnant with her second child. The defendant became distant and isolated herself from others. The defendant's behavior led Williams to believe she needed mental help. Like Berry, Williams

- 21 -

testified that the defendant had exhibited a very loving relationship with her first child.

Karen Sharp, one of the defendant's high school teachers, testified that the defendant approached her one day and advised that she would be dropping out of school. The defendant explained that she needed to get a job to take care of her daughter, because the defendant's mother was trying to take the child. Sharp described the defendant as a very proud and attentive mother. She took good care of her child. The defendant was also a very quiet, well-behaved, good student. Although she never observed the defendant's interaction with the second child, Sharp explained that the incident of placing the baby in the clothes dryer was inconsistent with the type of parent she knew the defendant to be.

The defendant's grandmother, Ella Mae Skiffer, also testified regarding the defendant's mental condition. Skiffer testified that the defendant lived at the Roosevelt Street residence with her at the time of the offense. According to Skiffer, the defendant's personality "changed tremendously" after she gave birth to J.A. She claimed the defendant started seeing and imagining things that did not exist, and talking to herself more. Skiffer explained that the defendant had, on occasion, talked to herself before, but this behavior occurred more frequently after J.A. was born. The defendant also became very paranoid. She repeatedly accused Skiffer and the defendant's mother of wanting to take her children. Skiffer described the defendant as an overprotective and caring parent.

Skiffer also testified regarding an incident wherein the defendant came home, out of breath, stating that someone in a black vehicle with tinted windows was after her. She stated that the vehicle had just turned around in the driveway. Skiffer stated that although she did not believe anyone was following the defendant (because she had not heard any sound of a vehicle on the gravel in the driveway), she told the defendant she was going to go check things out. When she returned, the defendant had locked her out. When Skiffer finally convinced the defendant to open the door, the defendant was armed with a knife. Her "eyes [were] big like somebody had scared her half to death." Skiffer testified about another vehicle incident in which the defendant collided with the rear of a vehicle that was stopped at a red light. The defendant again claimed that someone in a black car was following her. Skiffer did not believe anyone was following the defendant.

Skiffer stated that the defendant was severely depressed. Skiffer explained that she does not believe the defendant would have

- 22 -

harmed J.A. if she had been in her "right mind."  Skiffer denied any knowledge of suicide attempts by the defendant.

The defendant's aunt, Janice Johnson, also testified regarding the defendant's tendency to imagine things that did not occur. Johnson recalled a situation in which the defendant threatened to hit her sister with a hammer because she believed her sister had taken something from her.  According to Johnson, the defendant's sister had not taken anything from the defendant.  Johnson also testified that the defendant believed that the family members wanted her children. Johnson also witnessed the incident in which the defendant came home scared and told her grandmother that someone was following her, a story Johnson claimed was untrue.

Margie Marie Graves, the guidance counselor at the defendant's high school, testified about an incident in which the defendant came to her office upset and crying.  The defendant refused to reveal what was bothering her.  She just sat there and cried for approximately 25 to 30 minutes.  Graves assured the defendant that she could talk to her about anything.  The defendant did not open up. She simply asked Graves if she would call her mother to come and get her.  Graves complied. She later observed the defendant seated outside alone, staring at the ground.

Omika Johnson, another friend, testified that she and the defendant went to high school together.  Omika described the defendant as a very playful and interactive individual.  However, she explained that in January 2005, after the defendant and her oldest child moved in with Omika and her family, the defendant became very distant and antisocial.  The defendant did not join Omika's family at mealtime and did not converse with anyone.  Instead, she regularly chose to sit in her room in the dark.  Omika testified she once observed the defendant sitting on the bed in the dark, rocking back and forth, and mumbling to herself.  At that point, Omika concluded that the defendant was "crazy."

The defendant's mother, Jacqueline Brown, also testified about the defendant's bizarre behavior following J.A.'s birth. According to Brown, among other things, the defendant started isolating herself from others, started talking to herself, and began imagining people who did not exist.  Brown testified that one day the defendant left home walking and wandered aimlessly in the area for approximately two hours.  Concerned for her daughter's safety, Brown accompanied her.  The defendant did not talk to Brown during the walk and she refused to reveal what, if anything, was bothering her.  To Brown, this behavior was strange.

Brown further testified that the defendant suffered from depression and she acknowledged that a history of depression existed in their family.  On the issue of parenting, Brown, like the other lay witnesses, testified that the defendant was a good mother and loved her children.

As further evidence of the defendant's state of mind on the day of the child's death, Brown testified the defendant called and told her that someone broke into the house and killed her baby (the same story she told the 911 operator and initially the police).  However, Brown stated that once she arrived at the residence, the defendant, with a blank stare on her face, asked, "what is wrong with my baby?"

The defendant also presented expert testimony from forensic psychiatrist, Dr. Sarah Deland.  Dr. Deland testified that she participated in evaluating the defendant's competence to stand trial and her sanity at the time of the commission of the offense.  Her diagnostic impression was major depressive episode severe, with psychotic features, with postpartum onset in partial remission.  She also thought the defendant may have been dealing with posttraumatic-stress disorder (stemming from the event where Franklin attacked her with a knife).  The defendant was actively psychotic, actively paranoid.  Dr. Deland testified she was of the opinion that the defendant was unable to distinguish right from wrong at the time of the offense due to her mental illness.

On appeal, the defendant essentially argues that the jury failed to give proper weight to the lay testimony of the defendant's family and friends and the expert testimony of Dr. Deland, which led to a verdict of guilty instead of not guilty by reason of insanity.  Essentially, she appears to request that this court reweigh the evidence and overturn her conviction.

Although the defendant clearly had a history of major depression and the expert testimony presented conflicting views as to her state of mind at the time of the commission of the offense, the jury was free to evaluate and accept or reject, in whole or in part, the testimony of the witnesses offered by the parties, including that of the experts.  The jury, faced with the conflicting psychiatric evidence, obviously rejected Dr. Deland's opinion and accepted the opinions of Drs. Thompson, Vosburg, and LeBourgeois, thus, discrediting the possibility of insanity at the time of the offense.  We find no error in this determination.

Considering the totality of the evidence, we find that reasonable jurors could have concluded that the defendant failed to prove by a preponderance of the evidence that she was incapable of

- 24 -

distinguishing between right and wrong at the time of the offense. As previously noted, while there was evidence of defendant's history of severe depression presented at trial, there was also evidence, from multiple experts, that the depression was not at a psychotic level, and thus, the defendant was capable of distinguishing right from wrong at the time of the offense. Even though Dr. Deland opined that the defendant was unable to distinguish right from wrong at the pertinent time, the evidence established that the defendant attempted to conceal her involvement in the infant's murder when she initially talked to the police and to her mother to hide what she had done. Defendant fabricated the claim of an attack by unidentified males. As specifically noted by Dr. LeBourgeois in his testimony, if the defendant had suffered from some delusion or fixed false belief that her actions were not wrong, she would have disclosed her participation in the child's death when initially questioned. Also, in her taped statement to the police on the night in question, the defendant specifically stated that she "did not mean to kill him." This statement further supports a finding that the defendant was aware that the harm she inflicted upon J.A. by placing him in the dryer was wrong. The defendant's statement expressing concern that her family would "hate her" provides even further insight into her appreciation of the wrongful nature of her conduct. As Dr. LeBourgeois reasoned, if the defendant had not understood that placing the baby in the dryer was wrong, there would have been no reason for her to believe that her family would hate her for having done it. Based on these facts, a rational trier of fact could have found defendant failed to rebut the presumption of sanity by a preponderance of the evidence.

For the above reasons, when all the evidence is viewed in the light most favorable to the state, we find any rational trier of fact could have concluded, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, that the state established each essential element of second degree murder.

This assignment of error lacks merit.[21]

The Louisiana Supreme Court then denied her related writ application without assigning additional reasons.[22]

---

[21] Adams, 2010 WL 1838308, at *5-10; State Rec., Vol. VIII of XI.

[22] State v. Adams, 52 So.3d 885 (La. 2011) (2010-KO-1375); State Rec., Vol. VIII of XI.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless she shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, it is clear that she has not made the showing in the instant case.

As the state court correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Importantly, "[t]he Jackson inquiry 'does *not* focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Cavazos v. Smith, 132 S. Ct. 2, 4 (2011).

Moreover, as the United States Fifth Circuit Court of Appeals has observed:  "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence.  The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law."  Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted).  Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S.Ct. 2060, 2062 (2012).[23]

As noted, in the instant case, petitioner claims that the evidence was insufficient to convict her because the preponderance of the evidence established she was delusional and insane at the time of the commission of the offense.  As an initial matter, this Court notes that petitioner relies heavily on the fact that she suffered from mental problems, a point which is not in dispute. However, under Louisiana law, it is clear that "[c]riminal responsibility is not negated merely by the

---

[23]   It must additionally be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

existence of a mental disease or defect ...." <u>State v. Williams</u>, 346 So.2d 181, 186 (La. 1977); <u>see also</u> <u>Morgan v. Cain</u>, Civ. Action No. 05-6479, 2007 WL 3025056, at *7 (E.D. La. Oct. 15, 2007). A mental disease or disorder short of legal insanity is insufficient to support an insanity defense. <u>Williams</u>, 346 So.2d at 186; <u>see also</u> <u>Morgan</u>, 2007 WL 3025056, at *7; <u>State v. Koon</u>, 704 So.2d 756, 768 (La. 1997); <u>State v. Weber</u>, 364 So.2d 952, 956 (La. 1978).  Moreover, as the United States Fifth Circuit Court of Appeals has explained:

> In Louisiana, a criminal defendant is presumed to be sane and responsible for his actions.  The defendant may rebut this presumption based on a preponderance of the evidence.  Legal insanity is proved if the circumstances indicate that a mental disease or mental defect rendered the offender incapable of distinguishing between right and wrong with reference to the conduct in question. In light of Louisiana law on the issue of insanity, the question under the <u>Jackson</u> sufficiency standard is whether, viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that [the petitioner] did not prove by a preponderance of the evidence that he was insane at the time of the offense.

<u>Perez v. Cain</u>, 529 F.3d 588, 594 (5th Cir. 2008) (footnotes and quotation marks omitted).

Here, there was abundant evidence that petitioner was able to distinguish between right and wrong with reference to her conduct.  No less than three experts, Drs. Thompson, Vosburg, and LeBourgeois, testified that, in their opinion, petitioner was legally sane at the time of the crime. Further, petitioner told multiple lies about her involvement in the crime, concocted a story that strangers entered her house and committed the crime, and, ultimately, stated that her family would hate her for what she had done.  That conduct clearly indicates that she was aware that what she had done was wrong.  While it is true that the defense presented contrary evidence which could support a finding of insanity, it was the province of the jury to resolve those conflicts.  <u>See, e.g.</u>, <u>United</u>

States v. Hicks, 389 F.3d 514, 533 (5th Cir. 2004) ("When there is a conflict over testimony, the court will defer to the fact finder's resolution with respect to the weight and credibility of the evidence."); United States v. Casilla, 20 F.3d 600, 602 (5th Cir. 1994) ("The jury is solely responsible for determining the weight and credibility of the evidence; this court will not substitute its own determination of credibility for that of the jury.").

In summary, viewing the evidence as a whole and in the light most favorable to the state, the undersigned has no hesitation in finding that any rational trier of fact could have found beyond a reasonable doubt that petitioner failed to prove by a preponderance of the evidence that she was insane at the time of the offense. Accordingly, under the "twice-deferential" standard of review mandated by the AEDPA, this claim should be rejected.

In her federal application, petitioner also argues that the state failed to prove that she acted with the specific intent to kill or inflict great bodily harm.[24] To the extent that she is simply arguing that her purported "insanity" rendered her incapable of acting with specific intent, that is nothing but a meaningless variation on the foregoing claim and requires no further discussion. However, to the extent that she is arguing that, apart from the insanity issue, there was insufficient

---

[24] Rec. Doc. 4, pp. 43-44.

evidence of specific intent, that claim is patently frivolous.[25]  As the United States Fifth Circuit

Court of Appeals has explained:

> Specific criminal intent is "that state of mind which exists
> when the circumstances indicate that the offender actively desired the
> prescribed criminal consequences to follow his act or failure to act".
> State v. Williams, 714 So.2d 258, 263 (La.App. 5 Cir. 1998) (citation
> omitted). Specific intent is a question of fact which may be inferred
> from the circumstances and actions of the defendant.  Id. at 263.

Dupuy v. Cain, 201 F.3d 582, 589 (5th Cir. 2000).  Here, the state presented evidence that petitioner

placed her three-month-old son in the clothes dryer and turned on the machine.  She kept the infant

in the machine long enough for him to suffer head trauma, to sustain second and third-degree burns

over fifty percent of his body, and for pieces of his skin to make their way to the dryer's lint filter.

Unquestionably, that evidence, viewed in the light most favorable to the prosecution, was sufficient

for the jury to infer from the circumstances that petitioner had the specific intent to kill the child or

to inflict great bodily harm.

### D.  Ineffective Assistance of Counsel

Petitioner next claims that she received ineffective assistance of counsel at trial.  The

United States Supreme Court established a two-prong test for evaluating claims of ineffective

---

[25]  The state argues in its response that a claim challenging the sufficiency of the evidence on specific intent is unexhausted, Rec. Doc. 16, p. 5, an argument which petitioner disputes, Rec. Doc. 17, pp. 1-2.  However, this Court need not resolve that issue, because it is beyond cavil that a federal court has the authority to deny a *habeas* claim on the merits regardless of whether the petitioner exhausted her state court remedies and whether exhaustion is waived by the state.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998); Woods v. Cain, Civ. Action No. 06-2032, 2008 WL 2067002, at *8 n.8 (E.D.La. May 13, 2008).  Because this claim clearly has no merit, it is should simply be dismissed with prejudice on that basis in the interest of judicial economy.

assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced her defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).   A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).   "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).   Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner's ineffective assistance of counsel claims were rejected on the merits by the state courts in the post-conviction proceedings.  Because such a claim is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938

(2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S. Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 788 (citations omitted; emphasis added).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

Petitioner argues that her counsel was ineffective in several respects.  The Court will address each of those arguments in turn.

First, she claims that counsel was ineffective for failing to involve petitioner in her defense.  Specifically, she states her claim as follows:

> Had [defense counsel] had more contact with Adams, she would have been prepared to tell her side of the story and answer questions that the jury had in their mind concerning her actions.  Not being involved in her own defense was prejudicial to Adams because she was not able to assist with the selection of her witnesses and have any input on the questions that were asked of the witnesses that were questioned.  The outcome of the trial would have been drastically different had Adams been able to show the jury that she was reaching out for help for her mental illness prior to her arrest, and her primary care physician, ob-gyn doctor, and a Bogalusa LSU Medical Center emergency room doctor could have offered a lot of insight into her mental illness and the countless times that she had visited their offices seeking help.[26]

Those allegations are speculative and conclusory, and, as such, are insufficient to support an ineffective assistance of counsel claim.  See, e.g., Darby v. Johnson, No. 97-11403, 1999 WL 153045, at *2 (5th Cir. Mar. 9, 1999) ("An ineffective assistance of counsel claim based on speculation or conclusional rhetoric will not warrant habeas relief."); Green v. Johnson, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").  Moreover, again, the fact that

---

[26] Rec. Doc. 4, pp. 53-54.

petitioner suffered from mental illness was not in dispute; even the state's witnesses opined that she suffered from mental illness.  However, as noted previously in this opinion, mental illness alone does not exempt an offender from criminal responsibility under Louisiana law; rather, the legal defense of insanity applies only if the mental illness rendered the offender "incapable of distinguishing between right and wrong with reference to the conduct in question." La.Rev.Stat.Ann. § 14:14; see also State v. Silman, 663 So.2d 27, 32 (La. 1995) ("Criminal responsibility is not negated by the mere existence of a mental disease or defect.  To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question.").  Petitioner does not allege, much less prove, that any additional evidence was available to show that her mental illness was that severe.  As a result, she simply has not shown the prejudice required to support this claim.

Petitioner next claims that counsel was ineffective in requesting a jury trial.  At a hearing on August 11, 2008, petitioner waived her right to trial by jury;[27] however, on December 8, 2008, defense counsel changed course and moved for a jury trial, a request which the trial judge granted.[28]  As the state notes in its response, petitioner is now attempting to challenge that strategic decision made by counsel.  It is clear that courts are not to second-guess counsel's decisions on matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong

---

[27]  State Rec., Vol. I of XI, minute entry dated August 11, 2008.

[28]  State Rec., Vol. I of XI, Motion to Select Trial by Jury; State Rec., Vol. I of XI, Order dated December 8, 2008; State Rec., Vol. I of XI, minute entry dated December 8, 2008.

presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689; see also United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002) ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed. ... A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." (citations and quotation marks omitted)). That presumption is particularly appropriate here, because a decision concerning the mode of trial involves inherently subjective concerns that are not readily amenable to evaluation from a cold record, and because there are no professional norms with respect to the making of such decisions. See, e.g., Dickerson v. Bagley, 453 F.3d 690, 700 (6th Cir. 2006) ("Counsel necessarily had to make a choice between the two modes of trial, and it was impossible to say at the time which would be better for his client. We find no professional norms that dictate how a lawyer and his client should go about making this choice. There are no standards set out in the case law or the ABA Guidelines that establish professional norms in this area."); Bell v. Berghuis, Civil Action No. 2:11-CV-10004, 2014 WL 172259, at *17 (E.D. Mich. Jan. 15, 2014) ("There are no standards set out in the case law or the ABA Guidelines that establish professional norms as to how an attorney and his or her client should go about making the choice whether to proceed with a jury or bench trial. In the absence of such standards, this Court cannot conclude that counsel was ineffective for advising petitioner to waive his right to a jury trial."). Moreover, in any event, petitioner has not shown that she was prejudiced by the decision to proceed with a jury trial. Her suggestion that there is a reasonable probability that a bench trial would have resulted in a

different verdict is nothing but rank speculation.  In fact, considering the overwhelming evidence of petitioner's guilt, this Court has no doubt that the mode of trial had no bearing whatsoever on the verdict.

Petitioner also claims that counsel was ineffective for failing to move to suppress her confession on the grounds that she was incompetent.  Petitioner asserted on direct appeal that her confession should have been suppressed because she was in a "delusional state" when the statement was given and because she had been subjected to "improper questioning techniques by the police."  As previously discussed in this opinion, that claim was rejected by the state courts on direct appeal because it had been procedurally defaulted.  However, as also noted above, the Louisiana First Circuit Court of Appeal alternatively held that, even if the claim was not procedurally defaulted, it was meritless in any event.  That court stated:

> The defendant's argument appears to assert that the state has the burden of proving, beyond a reasonable doubt, that the mental defect she allegedly had (*i.e.*, delusions), did not affect the voluntariness of her confession.  However, it is well settled that, in proving the voluntariness of a confession, the state may rely on the presumption of sanity provided in LSA-R.S. 15:432, leaving to the defendant the burden to prove the existence of a mental abnormality which, under the circumstances, may have destroyed the voluntary nature of her confession. State v. Waymire, 504 So.2d 953, 958 (La.App. 1st Cir. 1987) (citing State v. Glover, 343 So.2d 118 (La. 1976)).  If the defendant fails to prove the existence of a mental defect or fails to prove that such disorder prevented the confession from being voluntary, the state is not required to negate the defendant's mental abnormality; however, the state, in all other respects, must prove beyond a reasonable doubt that the confession was voluntary. State v. Waymire, 504 So.2d at 958.  Because a defendant is presumed competent, the defendant has the burden of proving a mental defect making her unable to understand her Miranda rights and, therefore, incompetent to waive them. See State v. Waymire, 504 So.2d at 958.

In this case, the defendant failed to present any evidence at the suppression hearing regarding her mental condition and/or its effect on the voluntariness of the confession.  The testimony and other evidence established that, notwithstanding any depression, the defendant spoke willingly with the investigating officers when she admitted that she placed her infant son inside the clothes dryer and turned it on.  The defendant indicated sufficient presence of mind to concede that she initially lied about what occurred and she was telling the truth at the time she confessed.[29]

In order for petitioner to establish that her counsel was ineffective for failing to move for suppression of the confession based on incapacity, the onus was her to prove her claim.  However, she has not do so.  For example, she has not established deficient performance by showing that colorable evidence in fact existed which counsel could have discovered and produced in support of such a motion.  Moreover, even if she had produced such evidence, she still would not be entitled to relief unless she could also show that prejudice resulted from the deficient performance.  She clearly has not and cannot make that showing.  Even if counsel could have procured such evidence and even if the confession had been suppressed, the only true import of the confession was that it was an acknowledgment by petitioner that she placed the baby in the clothes dryer and turned on the machine.  That fact, however, was hardly in dispute, despite her initial ludicrous explanation to the police that unknown individuals happened to be on the scene when she took out the trash and, with no apparent motive, seized that opportunity to lock her out of her house and kill her baby in one of the most heinous ways imaginable.  The true issue in the case was not whether petitioner committed the crime, but rather whether she was legally insane when she did so.  Petitioner's sanity, however, was convincingly established by expert testimony at trial, as well as her own actions

---

[29] Adams, 2010 WL 1838308, at *4-5; State Rec., Vol. VIII of XI.

indicating that she was aware that what she had done was wrong.  Accordingly, there is simply no reasonable probability that a different result would have been reached in this case even if petitioner's confession had been suppressed.

Lastly, petitioner claims that counsel was ineffective for failing to perform an adequate pretrial investigation.  This claim is little more than a variation on her first ineffective assistance claim, and it suffers from the same defects.  For example, the bulk of this claim centers around petitioner's contention that additional witnesses were available to attest to her history of mental illness and her purported attempts to seek mental health care.  Even if she could prove that such witnesses were available and would have testified as she alleges,[30] there is no reasonable

---

[30] The Court notes, however, that petitioner has not in fact submitted such proof in support of her allegations.  That defect alone is fatal.  As the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.  This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); see also Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Here, petitioner has produced no evidence whatsoever, such as affidavits from uncalled witnesses, demonstrating that they would have testified in a manner beneficial to the defense. Therefore, she clearly has not met her burden with respect to this claim.  See, e.g., United States v.

probability that the verdict in this case would have been different.  As noted, even the state's witnesses testified that petitioner suffered from mental illness, and additional cumulative evidence on this point was unnecessary.  Again, the bottom line is that petitioner could only be found not guilty by reason of insanity by proving that her mental illness rendered her "incapable of distinguishing between right and wrong with reference to the conduct in question." La.Rev.Stat.Ann. § 14:14; see also State v. Silman, 663 So.2d 27, 32 (La. 1995).  She has not shown that further investigation would have revealed any evidence whatsoever proving that her mental illness was that severe.  Without that showing, she has not established that counsel's performance was deficient or that prejudice resulted.[31]

---

Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

[31]     The Court notes that petitioner has filed a supplemental memorandum to which she attached various medical and other records concerning her mental problems and her attempts to seek help for those problems.  She asks that this Court consider those documents as evidence supporting her claim that her counsel performed an inadequate investigation.  However, because those records were not submitted in support of her post-conviction application in the state courts, they cannot be considered by this Court.  As the United States Supreme Court has explained:

> We ... hold that review under [28 U.S.C.] § 2254(d)(1) is
> limited to the record that was before the state court that adjudicated
> the claim on the merits.  Section 2254(d)(1) refers, in the past tense,

The Court notes that, in connection with this claim, petitioner also argues that counsel should have investigated the circumstances of petitioner's interrogation by a Sergeant Tyson. However, petitioner's speculation that further investigation of that interrogation *might* have produced something beneficial to the defense falls far short of what is required to prove her claim.   Rather, to prevail on a claim of inadequate investigation, a petitioner must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information beneficial to the defense.   See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).   Petitioner simply has not made that required showing.

In summary, petitioner has failed to demonstrate that the state court decisions rejecting her ineffective assistance of counsel claims were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

---

to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).  Nevertheless, in any event, the records simply relate to petitioner's history of mental illness in general, a matter which is not in dispute; they do not concern whether petitioner was capable of distinguishing between right and wrong at the time of the crime.

States.  Accordingly, utilizing the AEDPA's "doubly deferential" standards of review applicable to such claims, this Court should likewise deny relief.

E.  Claims in Petitioner's Supplemental Memorandum

After the state filed its response in this proceeding, petitioner supplemented her federal petition to add several new claims.  Specifically, she additionally claimed that (1) her rights under the Fourth Amendment were violated because she was illegally "seized," (2) her counsel was ineffective for failing to move to quash the indictment on the ground that she had been denied a speedy trial, and (3) her counsel was ineffective for failing to impeach Zenadia Franklin.[32]  For the following reasons, these claims are unexhausted and procedurally barred.[33]

Pursuant to 28 U.S.C. § 2254(b)(1)(A), a petitioner normally must first exhaust her remedies in state court before seeking *habeas corpus* relief from the federal courts.  "To exhaust, a petitioner must have fairly presented the substance of [her] claim to the state courts."  Wilder v. Cockrell, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks omitted).  Generally, the federal exhaustion requirement is satisfied only when the grounds urged in a federal petition were previously presented to the state's *highest* court in a procedurally proper manner according to state court rules.  Dupuy v. Butler, 837 F.2d 699, 702 (5th Cir. 1988).  Having reviewed petitioner's writ

---

[32]  As discussed above, petitioner also supplemented her original ineffective assistance claims in her memorandum.  See *supra* note 31.

[33]  Because petitioner added these claims after the state had already filed its response in this proceeding, the state has not had the opportunity to raise these defenses.  However, it is clear that the Court may raise them *sua sponte*.  Prieto v. Quarterman, 456 F.3d 511, 518 (5th Cir. 2006); Magouirk v. Phillips, 144 F.3d 348, 357-58 (5th Cir. 1998).  Accordingly, petitioner is hereby specifically instructed that this Report and Recommendation is notice to her that this Court is *sua sponte* raising the defenses.  See Prieto, 456 F.3d at 519; Magouirk, 144 F.3d at 359.

applications filed with the Louisiana Supreme Court both on direct and collateral review,[34] the undersigned has determined that these three claims have never been presented to that court. Petitioner did not present a Fourth Amendment claim to the court in any of her writ applications, and, although she presented various ineffective assistance claims, she never presented these particular new claims.[35]   As a result, all three of the claims asserted in her supplemental memorandum are unexhausted.

In light of the foregoing, the claims are also procedurally defaulted in this federal Court.  It is clear that "[a] procedural default ... occurs when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present [her] claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted).  That is obviously the case here, because any new state post-conviction application petitioner filed asserting these claims would be barred by La.C.Cr.P. arts. 930.4(E) ("A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application.") and/or 930.8(A) (establishing a two-year statute of limitations for state post-conviction applications).

Of course, as explained earlier in this opinion, a *habeas* petitioner may still be afforded federal review of a defaulted claim in limited circumstances.  Specifically, a federal *habeas*

---

[34]   Those applications are contained in Volumes X and XI of the state court record.

[35]   The mere fact that she asserted other ineffective assistance claims in her state post-conviction proceedings does not constitute exhaustion of these ineffective assistance claims brought on bases not mentioned in the state proceedings.  See Ogan v. Cockrell, 297 F.3d 349, 358 (5th Cir. 2002); Burns v. Estelle, 695 F.2d 847, 849-50 (5th Cir. 1983); Evans v. Rader, Civ. Action No. 13-0196, 2013 WL 2154124, at *2 n.13 (E.D. La. Apr. 23, 2013).

court may review  a defaulted claim if the petitioner demonstrates either (1) the existence of "cause" *and* "prejudice" or (2) that a failure to address the claim will result in a "fundamental miscarriage of justice."  See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004).  Here, again, petitioner has demonstrated neither.  She has not established cause for the default of these claims, and, "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice."  Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).  Moreover, because she has not made a persuasive showing that she is actually innocent, she has not established that any miscarriage of justice will result from the application of the procedural bar.  Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001).

Therefore, for these reasons, petitioner should not be granted relief on the claims asserted in her supplemental memorandum.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Lakeisha Shanae Adams be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415,

1430 (5th Cir. 1996) (en banc).[36]

      New Orleans, Louisiana, this twenty-fifth day of March, 2014.

              **SALLY SHUSHAN**
              **UNITED STATES MAGISTRATE JUDGE**

---

[36] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.